[Civ. No. 12730. Second Dist., Div. Three. June 19, 1942.]

ELMA I. MOORE, Respondent, v. E. F. STELLA, Individually and as Trustee, etc., et al., Appellants.

Chas. I. Rosin for Appellants.

Maurice Gordon, as Amicus Curiae, on behalf of Appellants.

Joseph N. Owen for Respondent.

SHINN, J.—Plaintiff recovered judgment against defendant E. F. Stella upon thirteen causes of action in the sum of $9,775; upon one cause of action Stella-Harold Development Company, a corporation, was held jointly liable with Stella in the sum of $2,000, and upon three of the causes of action defendant Dallas M. Steele was held jointly liable with Stella in the sum of $1,200. The action is one for the recovery of sums paid by plaintiff for conveyances of mineral rights in prospective oil land in Glenn and Tehama counties, California, which were the subject of nine of the causes of action, and the purchase of stock of three corporations from defendant Steele, an agent of defendant Stella, from all of which transactions plaintiff had withdrawn by notice of rescission. The thirteenth cause of action was for money had and received and encompassed the matters covered by the other twelve causes of action. The basis of the judgment was that the instruments involved were securities within the meaning of the Corporate Securities Act and were sold without a permit of that Department and with intent upon the part of the sellers to violate and evade the provisions of the act.

Defendant Stella was a licensed real estate broker but held no broker's license from the Department of Corporations. Defendant Steele was employed by Stella as a member of his sales organization and received a commission of 25 per cent on sales made by her.

Stella acquired the mineral rights, but not surface rights, in some 1,546 acres in Tehama County and 5,760 acres in Glenn County. The Tehama County land was divided in parcels of two and one-half acres each, and the Glenn County land into one-acre parcels, and these were offered for sale and were sold and deeds were given to the public without any permit from the Department of Corporations. The subdivision plan had been submitted to the office of the Real Estate Commissioner and, except as hereinafter noted, the provisions of the California Real Estate Act (Stats. 1919, p. 1252, as

amended, Deering's Gen. Laws, 1937, Act 112) appear to have been complied with.

The sales of mineral rights were initiated by written agreement between Stella and the purchaser, one of them with plaintiff and which was typical of all of them, reading as follows:

"By this agreement, E. F. Stella agrees to sell and assign, and Mrs. Elma I. Moore agrees to buy, all of the mineral rights in and to 2 acre ½ to be selected by E. F. Stella, out of the acreage contained in Section 24, T. 23 N., R. 4 West, Tehama County, California, for the full purchase price of five hundred Dollars ($500.00) payable in the following manner: $500.00 cash, the receipt of which is hereby acknowledged and the balance of $ *cash in full*

"Upon receipt of said payment at the time and in the manner agreed, the party of the first part agrees to deliver to the party of the second part, heirs or assigns, a good and sufficient assignment of said 2½ acre parcel, on or before thirty (30) days from the date of last payment.

"Time is of the essence of this agreement and in the event of a failure to comply with the terms hereof by the said party of the second part, the said party of the first part shall be released from all obligations in law or equity to deed said parcel, and the said party of the second part shall forfeit all right thereto, and the right of possession thereof and to any money paid thereon.

"IN WITNESS WHEREOF, I have hereunto set my hand this 22 day of Mar , 1938.

Accepted:                                        E. F. STELLA
Name: Mrs. Elma I. Moore            By Dallas M. Steele
Address 420 So. Oxford Ave.
Phone FE 9553

"If official acknowledgment of this agreement or any future payments is not received by purchaser within 5 days from date thereto, notify E. F. STELLA, 831 West Second Street, Los Angeles, California.

"(Make all checks, drafts or money orders payable to E. F. Stella, Trustee)

"NOTICE: E. F. Stella will not be responsible for payments made with currency unless said currency has actually been received by him."

Pursuant to the agreements of sale conveyances were made in the following form:

"Reference is made to the fact that the undersigned, by a grant deed dated January 25, 1938, and recorded on the 26th day of January, 1938, in the office of the County Recorder of Tehama County, California, in Liber. 94 of Offical Rec. ords, page 406, Records of Tehama County, became the owner of the mineral rights on the acreage therein described.

"The undersigned hereby sells, assigns, transfer... and conveys to Elma I. Moore of 420 South Oxford Ave., Los Angeles, California any and all mineral rights in and to the following described parcel of property. The Northeast ¼ of the Northeast ¼ of the Southeast ¼ of the Northeast ¼ of Section 24, Township 23 North, Range 4 West, M. D. B. & M., and containing 2½ acres.

"In witness whereof, I have hereunto set my hand this 24th day of March, 1938.        E. F. STELLA"

It is to be noted that by the agreement Stella had the right to select the particular parcel to be conveyed from a described section of land, which, after being selected by him, was particularly described in a later instrument designated "Assignment." These conveyances transferred no surface rights to the respective purchasers. So-called assignments, which were in reality deeds of mineral rights, were made of all the interests purchased by plaintiff of land in Tehama County. She purchased twenty acres of land in Glenn County from Stella under the same form of agreement, which gave Stella the right to select the parcel or parcels he might choose to convey, but no deed was ever delivered to plaintiff on this purchase, although she paid Stella $1,200 as the full purchase price.

The court found that the transfers of mineral rights constituted securities within the meaning of the Corporate Securities Act; that the sales were made without a permit and in violation of sections 3, 4, 6, 7 and 9 of that Act. It was further found that four of said parcels lying in Tehama County were sold in violation of a *permit* issued by the Real Estate Commissioner, in that by the terms of the *permit* the same were not to be sold until the land had been surveyed and a map thereof filed and recorded with the county recorder of Tehama County, which survey was never made.

Before discussing questions as to the applicability of the

Corporate Securities Act to the conveyances of mineral rights, it should be mentioned that the complaint was also based upon charges of actual fraud. It was alleged that false statements were made to plaintiff concerning the value of said mineral rights and with respect to operations that were represented as being under way for the drilling of oil wells close to the lands sold to plaintiff and which were represented as about to be brought in as productive wells; that plaintiff was nearly eighty years of age, inexperienced in business, had no knowledge and received no independent advice concerning the matters as to which the representations were made; that the representations were wholly false, and that plaintiff was deceived thereby. The case was tried upon the issues relating to the alleged violations of the Corporate Securities Act by the defendants and not upon the issue of actual fraud, although the court made findings in plaintiff's favor upon the latter issue. Plaintiff does not contend that these findings are supported by the evidence, which on this phase of the case was quite incomplete, and they will be disregarded in our discussion.

Stella had been sales manager of El Claro Oil and Gas Company, a corporation which in 1932 was engaged in selling oil investments in Glenn County under a scheme which was denounced in a decision of the District Court of Appeal in *El Claro Oil etc. Co.* v. *Daugherty* (1936), 11 Cal. App. (2d) 274 [53 P. (2d) 1028, 55 P. (2d) 488] as in violation of the Corporate Securities Act. The operations which are involved in the instant case were a continuation of the same general promotional activities in different property under a slightly different scheme. However, the one here under review, we think, failed, as the one denounced in the El Claro case did, to successfully circumvent the provisions of the Corporate Securities Act. The property which was acquired by the investors consisted of a right to extract oil, gas and other mineral substances from the parcels of land conveyed and, it may be assumed for the purposes of this decision, such surface rights as would have been necessary in order to carry on proper exploratory and development work. The question before the trial court, which is determinative of the question of legality, was whether, in practical effect, the scheme under which the deeds were given contemplated and involved investment by the purchasers in an enterprise or venture conducted by others for earnings and profits or, more specifically,

whether investors were led to part with their money upon the promise and in the expectation that they would be able at some future time to lease their interests to some oil company upon a royalty basis and whether this inducement, though not expressed in writing, was the sum and substance of the entire scheme of investment. If the correct answer to this question is in the affirmative, then the deeds partook of the very essence of those types of investment contracts which throughout the history of legislation on the subject in this state have been deemed to be proper subjects for regulatory supervision. It is not necessary to assume, and it is not assumed, that every conveyance of mineral rights in a parcel of land comprising one acre or two and one-half acres is necessarily a security within the meaning of the Corporate Securities Act (Stats. 1917, p. 673, as amended, Deering's Gen. Laws, 1937, Act 3814).

Section 2(a), 7 of the act includes in the definition of the word "security" "any . . . certificate of interest in an oil, gas or mining title or lease," and the decisive question is whether the deeds issued to plaintiff fall within that definition. A deed to mineral rights may or may not be a security. The determination of its true character requires an inquiry which goes beyond the mere name of the instrument or the nature of the interest conveyed.

In deciding whether a given instrument is a security the courts have invariably looked through mere form to substance. (*People* v. *McCalla* (1923), 63 Cal. App. 783, 791 [220 Pac. 436]; *People* v. *Eiseman* (1926), 78 Cal. App. 223, 241 [248 Pac. 716]; *People* v. *Smith* (1931), 111 Cal. App. 177, 186 [295 Pac. 105]; *People* v. *Ratliff* (1933), 131 Cal. App. 763, 772 [22 P. (2d) 245]; *People* v. *Reese* (1934), 136 Cal. App. 657, 672 [29 P. (2d) 450]; *El Claro Oil etc. Co.* v. *Daugherty* (1936), 11 Cal. App. (2d) 274, 281 [53 P. (2d) 1028, 55 P. (2d) 488]; *People* v. *Yant* (1938), 26 Cal. App. (2d) 725, 736 [80 P. (2d) 506]; *Domestic & Foreign Pet. Co., Ltd.* v. *Long* (1935), 4 Cal. (2d) 547, 555 [51 P. (2d) 73].)

We are of the opinion that the evidence fully supports the finding that the mineral deeds were "certificates of interest" in an oil, gas or mining title and were therefore "securities" which could not be sold without a permit. In considering the nature of the instruments it is necessary to have an understanding of the mutual purposes and expectations of the parties and of the potentialities of the rights acquired by

the grantees as investments. ▌ Whether the transactions were clean-cut transfers of interests in real estate to be held, used, or sold by the grantees without participation with others in a profit-sharing venture on the one hand, or whether upon the other hand, while they were conveyances of definite interests in real property, they were intended by both seller and buyer to transfer rights to participate in earnings or profits in the nature of landowner's oil royalties that might inure to the benefit of numerous landowner lessors under community leases, was necessarily a question of fact for the trial court. There was evidence, both direct and circumstantial, which tended strongly to support the implied finding that the transactions were essentially of the latter class. ▌ For the following discussion we accept certain deductions of fact which we believe necessarily led the trial court to the ultimate finding of fact that the mineral deeds were securities. We regard the latter as a finding of fact rather than as a conclusion of law because it encompasses determinations of certain evidentiary facts relating to the nature of the rights acquired by the purchasers of "mineral rights," to the reasonable probabilities of the realization of returns in the way of oil or gas production, and to the practical and not merely the theoretical positions the purchasers occupied as owners of mineral rights in small parcels of land in a wilderness of undeveloped and unproven acreage. We believe that the trial court must have been satisfied from the evidence that it was highly improbable that these parcels could have been developed for oil by the owners or that either the defendants or the purchasers expected that they would be developed at all unless they should be grouped into tracts of sufficient size to justify expensive exploratory drilling. Our conclusions are to be understood as being predicated substantially upon the deductions mentioned.

In the El Claro Company case sales and assignments had been made by the corporation of interests in oil leases which it held as lessee, the lessee's rights being assigned to buyers as to certain specific parcels of the total acreage under lease. The purchasers then by separate instruments assigned their holdings to another corporation which was to drill and divide proceeds from production among the investors upon a pro rata basis. The interests sold by the corporation were held to be securities for the reason that the scheme, viewed in its entirety, contemplated participation by the investors in returns

from oil development to be conducted by the operating company. The fundamental facts and principles of the El Claro case cannot be distinguished from those of the instant case. To be sure, the investors here were not offered the opportunity to join in community leases or subleases, as they were in the El Claro case, but from the nature of the transactions and the surrounding circumstances it is clear that such leases were contemplated and in a practical sense that they were necessary in order to accomplish the exploration and development of the land for oil. The lands were located in unproven territory. There was a well producing gas which was under the control of Stella, who was financing the drilling of another well in the same locality. The cost of the latter well, if it should be drilled without mechanical trouble, was estimated by Stella at $75,000. There was no pretense at the trial and nothing in the evidence to suggest that any of the investors would ever have been able to drill oil wells themselves or that they had any intention of doing so. In a letter to the Real Estate Commissioner dated June 21, 1937, Stella said in part, referring to the well he was drilling: "I should complete it within a short period of time providing I am able to meet the financial requirements for the carrying on of the uninterrupted drilling. I find however that since the permit was granted my volume of sales has been very disappointing due to the fact that I am compelled to sell two and a half acre drill sites and must require down payments of not less than $25 and $25 monthly payments thereafter. I know of a good many worthy people who hold fairly good positions and have been steadily employed for many years and have been steadily employed by the same people for whom they are working who are really desirous of acquiring one of these drill sites, but the payment of $25 per month is more than they can possibly stand, and therefore they have to forego the opportunity of purchasing same." The letter was written as a request that the sale of drill sites of one acre each without change of existing prices might be authorized.

The court asked defendant Stella the following question: "Do you think it was within the contemplation of the parties that the plaintiff was going to go in there and put an oil well up?" to which Stella replied, "She can lease it to some one else" and further, "The court: Just like when you are selling these fractional interests or anything else. For instance, these people certainly could not go in and drill this

property when they haven't right of ingress or egress. The Witness: Oh, they can lease it, your Honor.'' Defendant Steele had acquired from Stella from time to time certain of the same type of mineral rights as those sold to plaintiff. She had been employed by El Claro Company as a member of its sales force. She testified with relation to her holdings in the present venture as follows: ''Q. Well, this oil purchase was really your first venture in oil, wasn't it? A. No, I lost this old syndicate, this old stock that you read in the law books, I lost in that, but I thought when I could buy my own deed and own the land myself and let the major companies do the drilling of the wells, I would have something worth holding for.'' Nowhere in the record is there to be found any testimony which even suggests a possibility of exploitation or development of an oil field in the lands in question other than through the medium of community leases. Of course each owner of a drill site would have the right to drill a well on it or to lease it separately for the drilling of a well (assuming that he also held the necessary surface rights), but the scheme of the promotion cannot be given a pattern drawn on this fantastic possibility. In his testimony defendant Stella frequently referred to sales and leases of small tracts of land in proven oil fields as justifying the prices he was receiving from investors in his own promotional schemes, and the inference is inescapable that these same arguments must have been a part of the stock in trade of the defendants and their salesmen. In theory an oil field might have been developed of such great value that each investor would have been able to lease each drill site he owned separately and without joining with other owners in a community lease. From a practical viewpoint this possibility was so remote as to be nonexistent for the simple reason that under the only feasible plan of development through the blocking up of large acreage in a common lease the several owners would have had no drill sites left upon which to give separate leases.      It is a matter of common knowledge that exploration for new oil fields is carried on under leases embracing large areas and that it is only in proven oil fields which have first been developed by those holding large acreage that further development is carried on under leases of smaller tracts, that the instances are yet more rare in which the development goes into closely subdivided areas under community leases, and that in yet rarer instances

so-called "drill sites" in well proven fields become the subject of independent development.

The deviations of the scheme from the one denounced in the El Claro case were of form and not substance, the only difference being that under the scheme used by the El Claro Company community leases were executed in connection with the original sale of mineral rights, whereas under the scheme involved in the instant case the actual execution of community leases, while essential to the exploration of the lands of the investors, was deferred to some indefinite future time when conditions might warrant the leasing of the land by oil-producing companies financially able to conduct oil development in a normal and businesslike manner. These are the principal reasons why we believe the trial court was justified in concluding that the mineral rights involved would be, in a practical sense, incapable of development except in the event and by means of operations conducted by others in which the several investors, as lessors, would be given the right to share ratably in landowners' royalties. The significance of this conclusion is obvious.

There have been frequent changes in the definition of the word "security" as used in the Corporate Securities Act in the interest of clarity and precision, but they have denoted no changes in the essential policy of the law. Apparently the amendments with respect to phraseology have been considered necessary in order to keep pace with the ingenuity of those promoters who persist in hunting for some hole in the law that is not plugged with a word. ▪▪▪ Deeds to interests in real property may be "certificates of interest" and hence "securities" although the word "deed" is not used in the definition.

In situations in which the facts were not different in fundamental respects from those disclosed in the instant case, the courts have held that conveyances in the form of deeds, employed as instruments for the transfer of interests in oil production, were in reality certificates of interest in oil and gas titles. (*People* v. *Jackson* (1937), 24 Cal. App. (2d) 182, 188 [74 P. (2d) 1085]; *People* v. *Daniels* (1938), 25 Cal. App. (2d) 64, 66-67 [76 P. (2d) 556].) Repetition of the reasoning which the courts followed in reaching this conclusion is wholly unnecessary, as is also citation of the authorities discussed and followed therein. It is true that the conveyances involved in those cases were of small interests in the fee title, or title to mineral rights, in land which was already under

lease for oil development, whereas, as we have pointed out, the several parcels of land in which plaintiff invested were not subject to an oil lease or leases. The parcels involved in the Daniels case were described by the court as being ''infinitesimal'' in area and those considered in the Jackson case were referred to as ''exceedingly small'' but these were only evidentiary facts mentioned by the court as bearing upon the essential features of the promotional plans under which the small participating interests were sold. It is not the area of the land sold that determines the question of validity of the deed; it is the nature of the rights acquired by the purchaser, considered as an investment. We have stated at length reasons why the circumstance that the land was not already under lease is not determinative as to the essential nature of the transactions in question. Plaintiff and others who invested in the enterprises of the defendants would have been in a better position had the land been under lease to a responsible oil company; at least they would have had the assurance that the exploration of the oil possibilities of their holdings would be conducted by a competent operator and in a manner and under a plan of development that would be fair to the lessors.

It is contended by defendants and in a brief of *amicus curiae* which we have allowed to be filed, that to require a permit for the sale of mineral rights under such schemes as defendants were using would infringe upon the rights of owners of land which may be oil-bearing to dispose of the same in small parcels, as owners of other lands have the unquestioned right to do without regulation under the Corporate Securities Act, and that the act does not provide for such regulation. The proposition suggests a *non sequitur*. In holding that the deeds to mineral rights issued by the defendants without a permit were invalid, we of course do not hold that every conveyance of a fractional interest in prospective oil land or of a segregated parcel thereof is a security or, more specifically, that it is a certificate of interest in an oil title. What we do decide is that the deeds issued by defendants under the circumstances related in this opinion and in light of the intentions and purposes of the parties with respect to possible returns to the investors as we understand them to have been, were certificates of interest in an oil title which could not lawfully be sold except under a permit of the Commissioner of Corporations. If we were to hold otherwise the bars would be thrown down for promoters of oil ventures to

go to the public with deeds to mineral rights instead of corporate stock, withholding the actual giving of oil leases until the land had been unloaded or perhaps not leasing the land at all, and the law as to such operations would be completely nullified. The Legislature has not either intentionally or inadvertently allowed a means of escape from regulation through such devices.

The brief of *amicus curiae* quotes at length from *People* v. *Anderson* (1939), 35 Cal. App. (2d) 23 [94 P. (2d) 627], a case in which it was held that sales of ore yet to be mined with a guarantee of a return of double the money invested were not sales of securities. That is not at all like our case. Had the sales in the Anderson case been of square-foot areas of a mining claim, with knowledge of the sellers and the purchasers that the latter did not intend to and could not work their several interests, but intended to lease them for a common operation under which they would be entitled to royalties, the facts would compare with those in our case, but we think the holding in the Anderson case would then have been different.

It has been the consistent policy of the state, as reflected in the various definitions of "security," to subject to regulation all schemes for investment, regardless of the forms of procedure employed, which are designed to lead investors into enterprises where the earnings and profits of business or speculative ventures must come through the management, control, and operations of others and which, regardless of form, have the characteristics of operations by corporations, trusts or similar business structures. The plan of operations followed by defendants comes within this classification.

Before leaving this phase of the case it may be worthwhile to again mention that the case before us is one in which plaintiff chosen has to disaffirm all of her transactions with the defendants and to renounce all claim of interest in or to rights accruing to her under the conveyances and has elected to demand the return of her money. The decision naturally is not determinative of the rights of other investors who have received similar deeds and who have elected or may elect to retain such interests as may have passed to them under their respective conveyances.

The court found as to certain of the sales of mineral rights that the same had been made in violation of a "permit" of the Real Estate Commissioner and found as a conclusion of law that they were made in violation of law. The record fails

to show that any order was made by the Real Estate Commissioner prohibiting the sale of any of the mineral rights which plaintiff purchased, under section 20(e) of the California Real Estate Act (Stats. 1919, p. 1252, as amended; Deering's Gen. Laws, 1937, Act 112), although it does appear that the report of the department contained a recital that the subdivider, Stella, agreed not to sell certain acreage, including that now under discussion, until a survey had been made and a map placed of record. The findings establish these facts and the further facts that the survey was not made and the map was not recorded. We find it unnecessary to consider the bearing, if any, which these facts would have upon the validity of the transfers, as the judgment finds support in the other facts found.

In one of the transactions plaintiff received an agreement for the sale of the mineral rights involved in the seventh cause of action, which was signed, "E. F. Stella by Dallas M. Steele" and the "assignment" that followed was signed "Stella-Harold Development Company by E. F. Stella, President." This is the cause of action upon which the Stella-Harold Development Company was held jointly liable with Stella and it is contended that there is no evidence of liability on the part of the corporation. There is no merit in this contention. In plaintiff's opening brief it is said, "In proximity to the development work that he was doing he [Stella] acquired, by mineral deed, considerable acreage, taken in the name of Stella-Harold Development Company, giving him the right to explore for oil or gas, with right of ingress and egress to the property . . . Appellant Stella divided this acreage in parcels of two and a half acres each and sold the same to the public, giving an assignment of all his right, title and interest in and to the mineral rights in and to the said property."

The evidence fully supports this statement of the relationship between Stella and the corporation. Whether the corporation was a principal in the transaction and profited thereby or acted only as the agent of Stella, it participated in the illegal sale and issuance of the security and was properly held to a joint liability with Stella. The court found that the corporation was the *alter ego* of Stella but it is not necessary to review the evidence upon which that finding rests. The finding was not necessary to establish liability on the part of the corporation.

The absence of findings on the eighth cause of action does not weaken the judgment; the all-inclusive findings on the thirteenth cause of action are sufficient.

Under proceedings for attachment a writ was issued against all of the defendants and was executed by levy upon property of Stella and Stella-Harold Development Company. All of the defendants joined in a motion to discharge the attachment upon the ground, among others, that plaintiff held security that was not without value, consisting of the properties which she had purchased; their motion was denied; they gave notice of appeal but their attempted appeal was dismissed because of their failure to perfect it. In deciding the motion to dissolve the attachment, after an extended hearing, the court made findings of fact and conclusions of law upon substantially all of the facts in issue, finding particularly that the mineral deeds and stocks were securities, that they were sold without any permit or broker's license, that the stock was sold with intent to violate and evade the provisions of the Corporate Securities Act, and that the debts for which plaintiff sued were not secured. Upon the trial plaintiff contended that the findings and conclusions upon the motion constituted a final determination of the facts in issue in the case under the doctrine of *res judicata;* the finding of the court was contrary to this contention and it is now put forward again as an independent ground for affirmance of the judgment.

In view of our conclusion that the judgment should be affirmed on the merits it is unnecessary to decide the point now urged by respondent, in further support of the judgment, namely, that findings and conclusions upon all of the issues in the case, made in plaintiff's favor upon a ruling by the trial court denying defendants' motion to discharge an attachment, which ruling became final upon dismissal of defendants' attempted appeal therefrom, constituted a final adjudication in plaintiff's favor upon all of the facts and points of law decided upon the motion, under the doctrine of *res judicata.*

The issues which involved sales of stock to plaintiff in three corporations were also correctly decided. The purchases were of stock of Fortuna Holding Corporation, K. B. P. Holding Corporation, and Summit Holding Corporation. The first named was originally the R. B. Knitting Mills, Inc. The second had been named Montroy Electric Co. Stella acquired the outstanding stock of these corporations which had been issued

under permit of the Corporation Department. After acquiring the stock he caused the names of two of the corporations to be changed and altered their corporate structures, in one case increasing the authorized number of capital shares and in the other case decreasing them. He surrendered the old shares of stock and caused to be issued shares under the changed capital structures; no permit was obtained for these issuances of stock. In some fashion or other defendant Dallas M. Steele acquired from Stella shares in each of the corporations and she made the sales to plaintiff from stock which stood in her name. All of the sums she received were immediately paid over to Stella and they were credited by the latter upon alleged purchases by Mrs. Steele from Stella of the same type of mineral rights as those sold to plaintiff. Both Mrs. Steele and Stella testified that Mrs. Steele owned the stock and that she had acquired some of it for a cash consideration, some of it in exchange for interests which she held in the El Claro Oil and Gas Company and other shares as bonuses in connection with the promotional enterprises in which she was engaged with Stella. The inquiry into the transactions between Mrs. Steele and Stella relating to her alleged purchases of mineral rights and her acquisition of the stocks was exhaustive but as an effort to learn the truth of the situation, was far from fruitful. The testimony of both defendants on these subjects was contradictory, evasive in the extreme, and disclosed an intention to conceal important facts. Mrs. Steele was utterly unable to tell when she had purchased mineral rights, how many parcels she had purchased, what acreage was embraced in the purchases, how much she had ever owned at any one time, how much she owned at the time of trial, how much she ever agreed to pay Stella for the conveyances, how much she had paid him, or how much she owed him, if anything. Defendant Stella produced some cards which purported to record purchases of mineral rights by Mrs. Steele, but the latter had no knowledge of these records and no records of her own. Equally unsatisfactory was the testimony of these witnesses with reference to the shares of stock supposedly acquired by Mrs. Steele, portions of which were later sold to plaintiff. No records of these transactions were kept by either party, there was no tangible or satisfactory evidence that Mrs. Steele had acquired any of the stock in bona fide business transactions, and the trial court was fully justified in concluding that the shares standing in the name of Mrs. Steele were held for de-

fendant Stella and were to be disposed of for his benefit. It was reasonably to be inferred that the stock was actually sold to plaintiff for the benefit of defendant Stella and that the alleged sales of mineral rights by the latter to Mrs. Steele were but a device set up to justify the payment to Stella of the proceeds from the stock sales. The three corporations whose stock was sold to plaintiff held mineral rights or leases or interests in production under oil leases and part of the stock of some of the corporations was owned by the other corporations. Stella was financing the drilling of oil wells on lands and under leases in which the three corporations were interested and in the returns from which they would share in the event of successful development. He was using the money derived from the sale of mineral rights to finance these oil drilling operations and, as we have seen, he realized cash from the sales of stock made by Mrs. Steele through the medium of transfers to her of mineral rights. The corporations appear to have been merely instrumentalities used by Stella to raise money for the purpose of acquiring mineral rights in land and for the purpose of drilling oil wells as a part of one comprehensive promotional scheme. It was largely for the use and benefit of the three corporations that defendant Stella was financing and drilling the several oil wells. It was only through the oil development program that the corporations could hope to profit, for they were engaged in no business or operations of their own and were possessed of no assets other than their oil interests which were intermingled with those of the defendants. One of the alluring inducements held out to investors was the fact that Stella was drilling the oil wells at his own expense. This was an important part of the scheme and the evidence was quite sufficient to warrant the trial court in believing that the sales of stock in the corporations by Stella for the purpose of raising money to be used in drilling the wells was also a part of the promotional scheme. The trial court also was justified in drawing an inference that the stock transactions between Stella and Steele and the later sales made to plaintiff were none of them bona fide deals in personally owned stock but were mere devices for financing the scheme; that they were made indirectly for the use and benefit of the corporations whose stock was sold, which benefit was received through the use of the proceeds from stock sales to finance the oil drilling operations on behalf and in the interests of the corporations.

The plan of the defendants in the larger view was to carry on oil development to attract purchasers of the mineral rights, and to use the money received on sales of mineral rights to carry on the development work and for the purchase of additional mineral rights. By devious means defendants sought to accomplish the same purposes that would have been accomplished in a lawful and legitimate manner by the authorized sale of stock of a corporation holding title to the mineral rights and engaged in developing them with the proceeds of stock sold to investors and for the benefit of stockholders. In other words, defendants had a purpose which may have been entirely lawful but which, for reasons which we do not know and which are unimportant, they chose to accomplish in an illegal manner.

It is insisted by appellants that although the stocks were securities they were lawfully sold as securities which were exempted under the provisions of section 2(c), 3 of the Corporate Securities Act, which provides that the act is not applicable to "The sale of securities when made by or on behalf of a vendor not the issuer or underwriter thereof who, being a bona fide owner of such securities, disposes of his own property for his own account, and such sale is not made, directly or indirectly, for the benefit of the issuer or an underwriter of such security, or for the direct or indirect promotion of any scheme or enterprise with the intent of violating or evading any provision of this act." In view of the purposes of defendants Stella and Steele in making the stock sales it is apparent that they were not disposing of their own property for their own account as bona fide owners of the securities, which would have been permissible under the foregoing provisions, but were making sales for the benefit of the issuing corporations and in the promotion of the scheme or enterprise of the defendants and, as found by the trial court, with the intent of violating and evading the provisions of the act, all of which rendered such sales unlawful when made without a permit.

There is likewise no merit in the criticism of the joint judgment against defendants Stella and Steele in the stock transactions. Upon the facts found Stella was equally liable with Mrs. Steele.

The point is made that plaintiff is not entitled to the return of the sums she invested with defendants except on con-

dition that she restore to them the interests in real property and the stock which she received in the transactions which she has rescinded. This point seems to be well taken. While in a technical sense no title passed to plaintiff, her mineral deeds were placed of record and constitute a cloud upon titles of her grantors, and presumably she is still in possession of the certificates of stock. Accordingly, the judgment is modified by adding thereto a provision reading as follows:

"That plaintiff, or if she fails to do so, the clerk of the court in her name, shall transfer all of plaintiff's right, title, and interest in stocks of Fortuna Holding Corporation, K. B. P. Holding Corporation, and Summit Holding Corporation, described in plaintiff's complaint, to Dallas M. Steele upon payment of plaintiff's costs of suit and the share of the judgment representing the sums (including interest thereon) paid by plaintiff for said stocks, and shall transfer by quitclaim deed to either E. F. Stella or Stella-Harold Development Company, respectively (whichever one may have been the grantor), the mineral rights as described in their respective conveyances that have heretofore been delivered to plaintiff, upon payment of her costs of suit (if the same shall not already have been paid) and the share or shares of the judgment representing the sums (including interest thereon) paid by plaintiff to defendant Stella for the several deeds to mineral rights as set forth in the findings of fact herein."

As so modified, the judgment is affirmed.

Schauer, P. J., and Wood (Parker), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied August 17, 1942.