[Civ. No. 22725.   Second Dist., Div. One.   July 14, 1958.]

OIL LEASE SERVICE, INC. (a Corporation), Appellant, v. W. H. STEPHENSON, as Commissioner of Corporations, etc., Respondent.

Ellis D. Reiter, Thomas J. Kelley and R. S. Jones for Appellant.

Edmund G. Brown, Attorney General, and Lee B. Stanton, Deputy Attorney General, for Respondent.

LILLIE, J.—Petitioner appeals from a judgment denying a petition for writ of mandate.

On November 8, 1954, the Corporation Commissioner issued a desist and refrain order against petitioner directing it not to deal in, or sell, offer or negotiate for the sale of, any securi-

ties consisting of certificates of interest in oil, gas or mining titles or leases.

After a hearing before the commissioner, the order was affirmed and in paragraph IV of his findings of fact the commissioner found:

"That Respondent offers to the public, through advertising in Los Angeles newspapers and its Oil News Letters, United States Government Oil and Gas Leases; that it receives from those members of the public who become its clients, authorization to acquire for them such leases upon a specified number of acres of land which is not described other than by the county and state in which it is located and by a tract number assigned by Respondent to an area within a certain Township and Range in which it can acquire such leases; that Respondent recommends 160 acre leases although leases of 80 acres, 320 acres and 640 acres are also offered; that pursuant to Government regulations the minimum oil and gas lease which may be obtained from the United States Government is 640 acres; that when respondent receives from a client an authorization to acquire for such client a United States Government Oil and Gas Lease of less than 640 acres, such as 160 acres, in an area described as above stated, Respondent secures in the name of its secretary a lease on 640 acres selected by it in the area chosen by its client and thereafter causes its secretary to assign to its client its interest in 160 acres specifically described and chosen by Respondent out of the 640 acres so acquired by it in the name of its secretary."

Thereafter petitioner filed its petition for writ of mandate. No evidence was taken, but a transcript of the testimony at the administrative hearing, the original exhibits and the complete record of the administrative proceedings were filed with the court below. It denied the petition; found the commissioner's findings were supported by substantial evidence and affirmed them; adopted paragraph IV thereof; and expressly concluded that in its transactions petitioner would be "offering, issuing and dealing in 'certificates of interest in oil, gas or mining titles and leases' for value" which constitute securities under the Corporations Code; and that its transactions would be unfair, unjust and inequitable to persons solicited therefor.

Although the issue before this court is whether there is substantial evidence in the light of the entire record to support the trial court's findings, the basic legal question is whether

appellant was engaged in the business of "selling, offering for sale, or negotiating for the sale, or dealing in" securities.

The testimony of George Muser, appellant's president, the exhibits and the respondent's return by way of answer to the alternative writ of mandate, not denied or contradicted by proof, establish the business operations of appellant corporation. Its business consisted of obtaining from the government, for members of the public, government oil and gas leases in varying acreage up to 640 acres on unproved government land. Under federal regulations, the minimum oil and gas lease which may be obtained from the government by an individual is 640 acres. The manner in which appellant obtained leases on acreage less than 640 acres was described by it in newspaper advertising, brochures and an OIL NEWS LETTER, by which it offered its various transactions to the public.

The OIL NEWS LETTER, for example, contained two sketch maps showing tracts Numbers 38-41 in Emery and Grant Counties, Utah, which were open for leasing. In referring to these counties appellant represented therein that:

"Leases are already changing hands at very fancy prices with substantial overriding royalties being held by the original owner. There is little doubt but that *many Government lease holders will become wealthy*, not only from cash bonuses they may receive, but also from monthly royalty checks they will receive because of the overriding royalties they hold.

"It is our sincere opinion that now is the time for you to acquire a U. S. Government Oil & Gas Lease in either Grand or Emery County, Utah, *ahead of the big drilling campaign.* On the maps of Emery and Grand Counties on pages 2 and 3 of this letter, we have shown certain areas where we can acquire for you Oil & Gas Leases on U. S. Government land. Our regular schedule of fees for this service is as follows:

| 640 Acres | ........$750 | 160 Acres | ........$250 |
| 320 Acres | ........ 450 | 80 Acres | ........ 130 |

"If you wish, you can take advantage of our time-payment plan which is 20% down and 20% per month for four months. Remember, now is the time to acquire Government Oil & Gas Leases in southeastern Utah. Get in ahead of the drill while opportunities for big profits exist." (Emphasis added.)

On page 5 thereof, the LETTER continued:

"Our business is serving clients and acquiring for them U. S. Government Oil Leases or assignments in areas that are considered favorable for the production of oil or gas or both.

We gather information regarding drilling activities, new fuel discoveries, leasing activities, etc., *in areas that seem to be well located for future production,* also check the records to learn what companies and individuals are leasing and where these activities are taking place. From all of this and other information we locate areas that appear favorable for future development. *We do all the work* necessary to acquire for you a U. S. Government Oil and Gas Lease in your name, and our fees shown below include payment of all Government charges for the first three years. . . . A question frequently asked of us is, *how much money may I expect to make* out of a U. S. Government Oil & Gas Lease? This question is, of course, impossible to answer definitely. However, there are constant examples which we can cite which will show what the possibilities are.'' (Emphasis added.)

The LETTER then referred to situations in other states in which large profits were made by persons who bought oil leases in *known oil structures.* Such reference sought to identify the oil land in the instant case with known oil structures in other states while the noncompetitive leases at bar specifically apply ''only to lands not within a known geologic structure of a producing oil or gas field.''

Another brochure entitled ''U. S. Government Oil and Gas Leases'' published by appellant is of the same tenor. It refers to the purchasers as ''investors'' and discusses at length the large profits which they could anticipate.

The lease recommended by appellant, and most commonly sold, was the 160-acre lease. Appellant's profits constituted the difference between what it paid the government for the lease and what it charged its purchaser—for example, on an 80-acre lease the cost was $52.50, the charge $130, and the profit $77.50; on a 640-acre lease the cost was $330, the charge $750, and the profit $420.

The operations of appellant were flexible, the modus operandi varying with the circumstances. Of the 450 transactions closed by it, approximately six different types of operation were used. They differed in detail, but common to all were the inducements. By way of advertising and brochures, appellant induced the prospective purchaser to buy an assignment of an interest in an oil lease as an investment in potential oil land representing to him that it would, for a fee, do all the work of selecting the best lease within a general area, using its expert knowledge, and secure the lease from the

government. The land was located in unproved territory. in another state. The purchaser, who had neither the ability nor the money to prospect for oil on his own account, was to do nothing more than pay the "fee." It was the plan, scheme and intention of appellant to induce the prospective purchaser to part with his money upon the expectation, created by its representations, that he would be able at some future time to assign his interest to some oil producing company for a large cash bonus and profitable overriding royalties when and after oil was actually discovered on the land. Such event would occur as the result of drilling by an unidentified oil company, or companies.

Of the six types of transactions used the first permitted the purchaser to choose the location of the lease. Appellant discouraged this practice and it was seldom used. In the few instances it was employed the prospective purchaser sent to appellant an authorization slip directing it to secure for him a government oil and gas lease on certain described government land. Upon receipt of this, appellant issued to him a signed confirmation slip confirming receipt of the authorization and describing the section proposed to be leased to him. Then appellant secured a lease thereon direct from the government in his name. A variation of this operation occurred when the purchaser authorized appellant to secure a 640-acre lease in a certain numbered tract containing 23,000 acres in a named county. Appellant then issued the confirmation slip to him and, purportedly using its superior knowledge and skill, selected the best and most promising 640-acres in the tract upon which to secure a lease for him from the government. In a third type of transaction appellant alone selected for the purchaser the land to be leased, purportedly using its special knowledge and skill, and telephoned its representative in Salt Lake City who had been previously supplied with applications for leases already signed by Miss Decker, an officer of appellant, as an individual. The representative filled in the legal description and in 15 minutes the property was leased in the name of Decker, she and appellant acting as trustees of money and property for the purchaser. When the purchaser paid in full, Decker executed an assignment form to the purchaser of a specific number of acres. The assignment form involved in all of these transactions did not constitute a lease until approved by the government. A fourth and popular type of transaction permitted the single purchaser and six or seven others, by way of authorization slips,

to authorize appellant to secure for each of them an 80-acre lease. Appellant consolidated these authorizations of the eight persons to make up 640 acres and issued its confirmation slip to each generally describing the parcel; purportedly using its superior knowledge and skill selected a specific 640 acres and applied to the government for a lease forwarding the application for the lease in Decker's name as an individual. When the lease in Decker's name was received and as each purchaser completed paying his "fee" Decker executed an assignment of 80 acres to him from the 640-acre master lease. For the eight leases appellant collected $1,040 for which it paid $330. Muser admitted that in taking the money and holding title to the master lease appellant and Decker acted as trustees for the purchasers. A fifth and equally popular variation of this transaction was used for the lone purchaser who wanted, for example, an 80-acre lease. The appellant consolidated enough single authorizations from other purchasers to make up 640 acres and issued a confirmation slip to each setting out a general description of the area. Then, purportedly using its special knowledge and skill, appellant selected the best and most promising 640 acres, upon which appellant forwarded to the government an application for a lease in Decker's name as an individual. When the lease in Decker's name was received from the government and the purchaser finished paying the "fee" Decker then executed an assignment of 80 acres from the master lease of 640 acres to him. In taking the money and holding title to the master lease, they acted as trustees for the purchasers. The sixth type of transaction was used when the appellant received, for example, five 80-acre authorizations totaling 400 acres. It issued a confirmation slip to each and then Decker applied for a 640-acre lease in her name. The difference of 240 acres became a part of appellant's inventory which was held in the name of Decker for assignment to any purchaser who subsequently applied. When one requested a 40, 60, or 80-acre lease, appellant immediately selected acreage from the inventory and assigned it to him.

Section 25008 of the Corporations Code in pertinent part provides: " 'Security' includes all of the following: (a) . . . any certificate of interest in an oil, gas, or mining title or lease; . . ."

In determining whether an instrument is a security within the meaning of the code, the court may look through mere form to substance (*Ogier* v. *Pacific Oil & Gas etc. Corp.*, 132 Cal.App.2d 496 [282 P.2d 574]) and consider the facts

and circumstances surrounding its execution to ascertain the true intent of the parties, their mutual purposes and expectations and the potentialities of the rights required by the purchaser. ▮ The determination of its true character requires an inquiry which goes beyond the mere name of the instrument or the nature of the interest conveyed. (*Moore* v. *Stella*, 52 Cal.App.2d 766 [127 P.2d 300].) ▮ Whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case. (*People* v. *Rankin*, 160 Cal.App.2d 93 [325 P.2d 10]; *People* v. *Syde*, 37 Cal.2d 765 [235 P.2d 601].) ▮ Appellant in its brief has set out isolated features of its business operations and cited various cases to impress this court that it merely sells a service to the public in assisting qualified citizens to acquire oil and gas leases from the government in acreage less than the 640 acres required under the law. It is clear from the record that appellant's business is far more complicated than it would have us believe and actually involves not only the issuance and use of certificates of interest in oil and gas leases and assignments of the same but investment contracts and collateral trust certificates, all of which are included in the statutory definition of "security"—certainly not in keeping with the oil and gas brokerage service appellant claims it operated.

Interestingly enough, appellant itself considered members of the public who did business with it as "investors." Throughout the administrative hearing, both appellant's counsel and its president referred to prospective purchasers as "investors," as did appellant's brochure, "U. S. Government Oil and Gas Leases." Of course, the mere reference does not in fact make them investors, but a reading of the brochures and Muser's description of appellant's operation leave little doubt that the whole scheme was sold to the public solely as an investment. Significant is the fact that in most of the transactions the purchaser himself did not select any particular 60, 80 or 160 acres for his lease, but as suggested in appellant's brochures entrusted his money to the appellant which made the selection for him and secured his lease on *some* 640 acres within a numbered tract. The purchaser did nothing but pay the "fee" and appellant, as represented by it, did all of the work. Obviously the purchaser gave his money to appellant in the hope and upon its representation that by the use of its superior knowledge, experience, information and skill it would select for his lease areas "that appear favor-

able for future (oil) development'' which he would be able to sell or assign later at a profit when oil was discovered and drilled by oil companies. Both purchaser and appellant knew that the areas involved were unproved land and that the purchaser had neither the knowledge nor experience to choose a potential oil area, nor the ability nor money to prospect or drill for oil. His profits, if any, depended not on his own efforts, or on the lease itself, but entirely on the efforts of others—first, on whether appellant, through its skill, chose for him an oil bearing area and, second, on whether an oil company would discover and drill for oil on that land. In *People* v. *Chait,* 69 Cal.App.2d 503 [159 P.2d 445], fractional lots of land were sold upon the representation they were either ''proven oil land'' or that negotiations were then pending with major oil companies operating in the district and that leases would be made with these companies by virtue of which purchasers would receive large bonuses or royalties. ▮ In holding that the transactions constituted investments and hence securities, the court, citing *Securities & Exchange Commission* v. *Bailey,* (S.D. Fla.) 41 F.Supp. 647, said at page 650: ''An 'investment contract,' as contemplated by the Act, is one which contemplates the entrusting of money or other capital to another, with the expectation of deriving a profit or income therefrom, to be created through the efforts of other persons. . . .'' (*Domestic & Foreign Petroleum Co.* v. *Long,* 4 Cal.2d 547 [51 P.2d 73] ; *People* v. *Jackson,* 24 Cal.App.2d 182 [74 P.2d 1085] ; *People* v. *Daniels,* 25 Cal.App.2d 64 [76 P.2d 556] ; *People* v. *Yant,* 26 Cal.App.2d 725 [80 P.2d 506] ; *Moore* v. *Stella,* 52 Cal.App.2d 766 [127 P.2d 300].) ▮ This same test was followed by the court in *People* v. *Rankin,* 160 Cal.App.2d 93 [325 P.2d 10] : ''It is settled law that any deed, certificate of interest or like instrument of conveyance or assignment falls within the act only when it appears directly or inferentially that the buyer contemplates receipt of profits from activities of other persons, such as carrying on a business, drilling an oil well, or sinking and operating a mine; the mere conveyance to him of a fractional interest in a piece of land or other type of property is not subject to the statute if the buyer must look only to the thing bought or his own efforts to produce a profit to himself.''

Appellant's argument that the case of *People* v. *Anderson,* 35 Cal.App.2d 23 [94 P.2d 627], supports its position could be persuasive only if we are to ignore the details of appellant's

business operations. ■ It devotes much of its brief to the contention that the size of the acreage in the leases assigned is determinative on the question whether securities are involved. It is true that the size of the area conveyed may be considered by the court in determining the real substance of the instruments in question, as discussed in cases cited by appellant, but it is also clear from these same authorities that size alone is not determinative; that it is only one factor to be considered with other facts and circumstances surrounding their execution.

■ Many of appellant's transactions also involved trust arrangements wherein the money of the purchaser was held by appellant, or its representative, in trust, together with title to the lease until it was assigned. The instrument evidencing this trust relationship was the confirmation slip describing the proposed acreage to be selected by appellant, by the use of its purported expert knowledge and skill, and actually issued to the purchaser by appellant as trustee for the money entrusted to it by him and the 640-acre oil lease obtained in its, or Decker's name, until divided and assigned to purchasers. Moreover, it appears that the confirmation slip employed in this manner clearly constituted a certificate of interest in an oil lease.

■ Appellant contends that any assignment of a part of a 640-acre lease becomes a distinct and separate lease under federal law and constitutes a lease under California law, not a security. Appellant seeks refuge behind the "U.S. Government" label, implying that it constitutes a stamp of approval on its activities and contending that they are entirely proper in that it deals with the United States Government, in United States oil and gas leases, on United States government land under federal regulations and that the relationship of lessee and lessor is one between the purchaser and the government and not the appellant. Appellant cites certain regulations of the Federal Bureau of Land Management, and government circulars, in its contention that any assignment of a part of a 640-acre lease becomes a separate lease under federal law. In presenting such an argument, appellant overlooks the very feature of its operations that clearly brings most of its transactions within the purview of the Corporations Code—the use of the assignment form which could not possibly constitute a lease until the assignment of lease was approved by the government. Even a reading of the brochure published by appellant discloses that for an investor to purchase 160 acres,

as recommended by appellant, he can do so only by receiving an assignment of a portion of a 640-acre lease. This is accomplished by the assignment form entitled, "Assignment Affecting Record Title to Oil and Gas Lease." It is clear from Muser's testimony that the only way in which a purchaser could obtain a lease to acreage less than 640 acres was by purchase of an assignment of a portion from a master lease of 640 acres held by appellant or its representative. In the assignment the assignor was the appellant, or one of its representatives, as owner of the record title interest in an oil and gas lease theretofore issued to it by the government. The assignor by this document assigned to the purchaser "the right, title and interest in and to the lands embraced in such lease as specified below." In the ordinary assignment form, the "lands" affected by the assignment were the 160 acres chosen for the purchaser by appellant from a 640-acre lease. Until this assignment form was submitted to the government for its approval of the assignment by appellant from its master lease to the purchaser, the document did not become a lease with the government. This document so employed clearly brings it within the operation of section 25008 of the Corporations Code.

The name of the instrument making the conveyance is of little consequence and no matter how it be disguised, the court may inquire into, and rely upon facts and circumstances collateral to the transfer of the interest more than upon the exact type of interest conveyed. (*Moore* v. *Stella,* 52 Cal.App.2d 766 [127 P.2d 300].)

We find no case involving the same factual situation as the one at bar, but it is interesting to note that the representations made by the defendant in *People* v. *Chait,* 69 Cal.App.2d 503 [159 P.2d 445], were similar to those made in the instant case. There the instruments were securities because the lands were purchased as investments in "proven oil lands." The options to purchase "oil lease assignments" held to be securities in *People* v. *Rubens,* 11 Cal.App.2d 576 [54 P.2d 98, 1107], were similar to the transactions at bar in that there was no description of the allotted portion covered by the option. Helpful, however, is the court's decision in *Ogier* v. *Pacific Oil & Gas, etc. Corp.,* 132 Cal.App.2d 496 [282 P.2d 574]. Although the discussion concerning securities arose out of an issue of pleading, the court's views of the facts pleaded, if found to be true, are of interest. The complaint alleged, among other things: "that on specified occasions defendant

A. F. Hilding induced her (plaintiff) to buy one of the said certificates of interest; that each defendant knew the land was in unproved territory and that plaintiff had neither the money or ability to prospect for oil; that it was the plan and scheme of defendants to induce plaintiff to part with her money upon her expectation that she would be able at some future time to lease her interest to defendant Pacific Oil and Gas Corporation or some other oil company and thereby receive large and prospective oil royalties when oil was actually discovered on said land as the result of drilling thereon by either the defendant corporation or some other oil company.'' (P. 501.) The court's first inquiry was whether the deed to land represented as oil bearing constituted a ''certificate of interest.'' In deciding that it did, and considering at length the cases of *People* v. *Chait, supra,* and *Moore* v. *Stella, supra,* it stated at page 504: ''One of the allegations of the complaint is that, in pursuance of the scheme to defraud plaintiff, defendants adopted the 'device of executing grant deeds to plaintiff purporting to convey title to said prospective oil lands, or to a fractional undivided interest therein, but each such instrument was in fact a certificate of interest and a certificate of interest in an oil title.' Under the allegations of the complaint, the triers of the fact could determine that the transactions were not clean-cut transfers of interests in real estate to be held, used or sold by plaintiff without participation with others in profit-sharing ventures but it was intended by both seller and buyer that, while they were conveyances of definite interests in real property, they actually were to transfer rights to participate in earnings or profits in the nature of landowners oil royalties that might inure to the benefit of others under leases. This seems to be the test laid down in *Moore* v. *Stella, supra,* 52 Cal.App.2d 766, 773.'' The facts set out in the pleadings in *Ogier* v. *Pacific Oil & Gas etc. Corp.,* 132 Cal.App.2d 496 [282 P.2d 574], are similar to those at bar. An examination of the record discloses substantial evidence to support the findings of the court below that appellant's transactions and operations involved offering, issuing and dealing in certificates of interest in oil, gas or mining titles and leases for value for which a permit is required from the corporations commissioner.

Appellant's discussion of the legislative theory of regulating investments in California and the intent and purpose of the corporate securities law serves to point up the great need for protecting the public and the necessity for our courts to in-

quire into the circumstances surrounding certain transactions to determine their true character. In the face of the admonition given by appellant, we have used this test to determine the true character of the instruments involved in the instant case and looking through their legal form we find, in reality, certificates of interest in oil leases and assignments thereof, investment contracts and collateral trust certificates employed by appellant which were ''particularly adapted to perpetuation of the evil which the statute (Corporations Code) was designed to eradicate.''

No contention having been made that the court erred in finding that appellant's transactions and operations would be and are unfair, unjust and inequitable to persons solicited by it to acquire these securities, we assume that it has abandoned any objection thereto.

Judgment affirmed.

White, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied August 1, 1958, and appellant's petition for a hearing by the Supreme Court was denied September 10, 1958. Schauer, J., Spence J., and McComb, J., were of the opinion that the petition should be granted.