[Civ. No. 4964. Third Appellate District.—November 8, 1933.]

L. SILVA et al., Respondents, v. E. L. MacAULEY, Defendant; DAVE DONDERO et al., Appellants.

U. S. Webb, Attorney-General, Jess Hession and Emmett J. Peterson, Deputies Attorney-General, and Eugene D. Bennett for Appellants.

Charles Kasch for Respondents.

PLUMMER, J.—The plaintiffs had judgment against the appellants for the sum of $428 damages suffered by them for and on account of the destruction of a certain lot of crabs, and the taking by the appellants and depriving the plaintiffs of the use of a certain automobile.

The findings of the court, which are amply supported by the testimony, are to the effect that on or about the first day of July, 1932, the plaintiffs had brought into the state a truckload of fresh crabs consisting of 30 sacks which had been caught in the Pacific Ocean off the state of Oregon, and were transporting the same through the counties of Del Norte, Humboldt, Mendocino, Sonoma and Marin to the city and county of San Francisco. The truck was in charge of an employee of the plaintiffs. That said crabs were being transported through fish and game district No. 1½, and to a point in fish and game district No. 2 outside said district No. 1½, being taken through this district as a part of transporting the same from the state of Oregon to the city of San Francisco. That on or about the second day of July, 1932, near the county of Mendocino, the appellants, purporting to act in their official capacity as deputy fish and game commissioners, without any search-warrant or legal process, intercepted the aforesaid truck, arrested the driver thereof, took possession of the crabs, and disposed of the same to persons unnecessary to mention herein, and deprived the plaintiffs of their property, against their will and without their consent, and to their damage, for which judgment was given by the court, as aforesaid.

The findings also are to the effect that the appellants at the same time took and retained possession of the plaintiffs' truck and deprived the plaintiffs of the use thereof, for which damages were allowed by the court.

The court further found that at the time of the seizure of said crabs they were not being transported through fish and game district No. 1½ into fish and game district

No. 2, in violation of the provisions of section 628 of the Penal Code.

The appellants justify their seizure of the crabs referred to and base their appeal upon subdivision "C" of section 628 of the Penal Code, which at the time involved read as follows: "Every person who ships or offers for shipment, or who transports or carries any species of crabs from fish and game districts 1½, 2½, 5, 6, 7, 8 and 9, either to a point outside of the state, or to any part of the state other than districts 1½, 2½, 5, 6, 7, 8 and 9, or who holds any crabs in live cars within said fish and game districts is guilty of a misdemeanor." The provision of the codes as to the disposition of crabs seized by the officers not being material, is not set forth herein.

Prior to the filing of the findings herein, the learned judge of the trial court filed a written opinion in this cause which so clearly sets forth the facts and the law applicable thereto that we adopt the following excerpts therefrom as the opinion of this court:

"The evidence in this case is uncontradicted that plaintiffs were engaged in the business of purchasing crabs at Port Orford, in the state of Oregon, and transporting the same along the Redwood highway from the state line of California on the north through the counties of Del Norte, Humboldt, Mendocino, Sonoma and Marin to the city and county of San Francisco.

"That part of Del Norte and Humboldt counties through which the crabs were transported is within fish and game district No. 1½, and that part of Mendocino county through which they were transported is within fish and game district No. 2. (Secs. 3 and 24 of Act 2874, Deering's Gen. Laws, vol. 1, p. 1350.)

"Defendants justify their seizure of the crabs under subdivision 'C' of section 628 of the Penal Code, and their distribution under subdivision 2 of section 642 of the Political Code. Presumably, the claim of defendants is that the truck was to be used as evidence on the trial of the case, and was, therefore, the subject of seizure. (*People* v. *Chaigles,* 237 N. Y. 193 [142 N. E. 583, 32 A. L. R. 680] ; *Henderson* v. *United States,* 12 Fed. (2d) 528 [51 A. L. R. 424].)

"If Del La Torre, at the time of the arrest and seizure, was not engaged in a violation of subdivision 'C' of section 628, Penal Code, plaintiffs are entitled to be reimbursed for the damages which they suffered by reason of what, in such cases, would be an illegal seizure and conversion of the crabs, and an illegal seizure and detention of their truck.

"A person whose property is illegally seized may replevy the same from the officer seizing it, or, if it has been destroyed, he may have an action for its value. In such case, the burden is upon defendants to prove a justification under the statute. (*Lawton* v. *Steele*, 152 U. S. 133 [14 Sup. Ct. 499, 38 L. Ed. 390].)

"Subdivision 'C' above referred to makes it unlawful for any person to transport or carry any species of crabs from fish and game district No. 1½, in which Humboldt county is located, to any point outside the state of California, or to any point within the state other than certain districts of which Mendocino county is not one.

"The question therefore arises whether the foregoing subdivision of section 628 prohibits the transportation of crabs *through* Humboldt county, if the point of origin of the shipment is without the state boundary. To hold that it does would require that the word 'from' in the statute be interpreted to include the word 'through'.

"A court may not legislate; that power is reserved to the law-making body of the state. The legislature has declared it a public offense to ship crabs *from* a designated district to another, but has not prohibited such shipment *through* the district. If it had been the intention of the legislature to forbid the transportation *through* a district, it could readily have so enacted, but it did not.

"The court may not, by construction, make that a crime which is not prohibited. (16 Cor. Jur., p. 65.)

"The Supreme Court of the United States has said: 'Where a law is plain and unambiguous, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction.' (*United States* v. *Fisher*, 2 Cranch, 399 [2 L. Ed. 304].)

"The supreme court of Indiana quotes approvingly the following language from Wharton Dog. 569: 'The best rule by which to arrive at the meaning and intention of the

law, is to abide by the words which the law-maker has used.' (*Case* v. *Wildridge*, 4 Ind. 51.)

"The word 'from' always implies a starting point, whether it be of time, place or condition. In Standard Dictionary it is defined as: 'Having a starting point of motion; noting the point of departure, origin, withdrawal, etc.; out of, starting at, as, he traveled from New York to Chicago.'

"In *Case* v. *Wildridge*, *supra*, the supreme court of Indiana had before it a case arising under the law of succession of that state. The statute provided that property received by the deceased 'by descent *from* the mother' should vest in the brothers and sisters of the deceased. The court held that this did not include property that the deceased acquired *through* her mother from the maternal grandfather. In other words, that 'from' does not mean 'through'.

"The Supreme Court of the United States, speaking through Mr. Justice Story, in passing upon a statute of succession of the state of Rhode Island, says: 'A descent *from* a parent to a child cannot be construed to mean a descent *through* and not *from* a parent.' (*Gardner* v. *Collins*, 2 Pet. (U. S.) 58 [7 L. Ed. 358].)

"If the crabs in question were being transported from Humboldt county at the time of the seizure, it could as readily be contended that when they reached Sonoma county they were being transported from Mendocino county. It is not a crime to transport crabs from Mendocino county, and therefore, if defendants' construction is correct, even if crabs were originally taken in Humboldt county and shipped from that county, they would be contraband only so long as the last district through which they passed was a prohibited district. This certainly would not make effective the laws for the protection of crabs. It seems clear that section 628 of the Penal Code which prohibits transportation of crabs *from* Humboldt county, does not prohibit transportation *through* Humboldt county. Hence, the officers were not justified in their seizure of the crabs and truck involved in this action. The act of the defendants constituted a conversion of the crabs (24 Cal. Jur., p., 1024), and the measure of damages is laid down by section 3336 of the Civil Code. The crabs were not returned to

plaintiffs; hence, the latter are entitled to the market value at the time of the conversion, with interest.''

By using the name of the element in which crabs abound, the meaning of the statute under consideration is made plain. Prohibiting the taking of crabs from district 1½ means taking crabs from the waters within district 1½, where crabs are found. It means simply this, and nothing more. Thus it is readily perceived that a statute prohibiting the taking of crabs from the waters within district 1½ has no application or relevancy whatever to the conveyance of crabs over the highways in Humboldt or Mendocino Counties, when the crabs are taken from the waters of the Pacific Ocean adjoining Port Orford, a location some 300 miles to the northward, and beyond the jurisdiction of the state. The intent of the legislature and the meaning of the statute was and is to prohibit the taking of crabs from the waters of district 1½. There is nothing in the statute which suggests that the legislature intended to penalize the bringing into the state of crabs taken from the waters other than the districts mentioned. Nor is there any persuasive force to the contention that holding that a statute prohibiting the taking of crabs from the waters where crabs abound in district 1½ means the same and includes the conveyance through the district, of crabs taken elsewhere, would add to the difficulties of enforcing the provisions of section 628 of the Penal Code. An act which is perfectly right and lawful cannot be held criminal in order to enable prosecuting officers to enforce the penal provisions of a statute.

As applied to this case the statement which we have made is rendered doubly clear. The record shows that just south of the line between the states of Oregon and California a quarantine station is maintained through which all trucks and automobiles coming down the road known as the ''Redwood Highway'' must pass through on their journey southward. Though spoken of as a ''checking station'' the testimony discloses that the truck in which the confiscated crabs were being transported passed through the quarantine station, or was checked through as described by the truck driver. No attempt was made to surreptitiously bring the crabs into the state of Oregon. No difficulty was presented in ascertaining from whence the crabs were brought. The

slightest investigation would have disclosed their source. Nor is there anything in the record supporting the contention that the defendants were misled by any act of the plaintiffs or of the truck driver. Their own testimony shows that they acted upon a "tip that a truckload of crabs was passing through". The defendants themselves made no contention before the trial court that they were misled. No questions were asked by them of the truck driver, from what waters the crabs had been taken. The defendants appear to have been wholly indifferent as to whether the crabs were taken from Port Orford or any other place; they were simply seizing a truckload of crabs that was passing through. Had any questions been asked of the truck driver as to the source of the crabs, the truth or falsity of his answers as to where they had been obtained could have been ascertained in a very few minutes. A telephone inquiry to the quarantine station to which we have referred would have furnished the information within a short space of time. Common knowledge, of which we must take notice, establishes these facts. It is a matter of every-day occurrence that connection is had by telephone between points several hundred miles distant within a very few minutes, frequently before the one placing the long distance call is allowed to hang up the receiver.

The only reference to the record upon which the contention is made that the officers were misled is the following conversation which took place after the truck driver had been stopped. (Question of the truck driver): "What did they say to you? A. Well, just as I drove by, they gave me the siren and stopped me and said, 'What have you in the truck?' and I told them 'Fish', and they said 'Yes?' They got a searchlight and went to the back and lifted up the canvas from the truck and said, 'Crabs, hauling crabs, are you?' and I said 'Yes,' so he told me to turn around and drive back to the garage." On the way back a police officer by the name of Fisk spoke to the truck driver and said, "My God, man, don't you know you are wrong doing this, might get in wrong?" To which the truck driver replied, "A fellow has to take a chance once in a while." This latter conversation occurred after the crabs had been seized and the truck driver was being taken on his way to jail. So far as the record is concerned it does not appear

that the conversation between the police officer and the truck driver was heard by the defendants. It does appear that they took no action in relation thereto, and as we have said, made no inquiries as to what waters the crabs had been taken from. The testimony of the truck driver does not include the conversation. ■ The conversation between the police officer and the truck driver not having been shown to have been had in the presence of the defendants, or repeated to them, should have been excluded.

■ No error is shown in the exclusion of the testimony of what took place before a justice of the peace when the truck driver was taken before him. The offered record is not made a part of the transcript, and therefore there is nothing before us upon which we would be authorized to disturb the ruling of the trial court. ■ The fact that the justice of the peace made the mistake of holding the truck driver guilty of a misdemeanor in conveying the crabs through Mendocino County, which holding was promptly set aside by the trial court, is wholly immaterial. The crabs had been seized and disposed of prior to that date, and the tort in wrongfully seizing the plaintiff's property was committed by them prior thereto, and was in nowise dependent upon the mistakes of the justice of the peace.

In the recent case of *Abbott* v. *Cooper et al.*, 218 Cal. 425 [23 Pac. (2d) 1027] (opinion filed June 29, 1933), the Supreme Court had occasion to pass upon the liability of officers acting in excess of their authority, and held that whenever officers purport to act in the line of their official duty, but in excess of their authority, a tort is committed, and that liability for such tort is thereby fixed not only upon the officials committing the tort, but also upon the principals. The civil liability of an officer committing a tort appears to be exactly the same as that of a civilian. ■ Thus, whenever an officer seizes property unlawfully, even though under color of his office, an action for damages may be maintained against him, and if acting in behalf of a principal, also against the principal, the same as though the damages were inflicted by private individuals. The reported cases generally have to do with principals whose deputies have committed the tort. However, both deputy and principal are governed by the same rule, and subject to the same liability.

In 1 A. L. R., page 236, the law is thus stated: "The general rule has long been settled that sheriffs and other officers performing similar duties are civilly liable, but not criminally, for the acts and omissions of their deputies when acting officially or under color of office." This general rule is supported by a long list of cases cited, which are too numerous to be set forth herein, and therefore are only referred to.

To the same effect is a long list of cases found in 18 A. L. R., page 197, in annotations following the case of *Manwaring* v. *Geisler*, 191 Ky. 532 [230 S. W. 918, 18 A. L. R. 193], a case in which a motorcycle policeman was held liable for an injury caused by his negligence when riding his motorcycle to a fire. Here, again, the cases are too numerous to be listed herein.

In 39 A. L. R., page 1306, the rule is laid down and supported by numerous authorities that a peace officer is liable upon his bond for negligence causing personal injury or death.

In 53 A. L. R., page 41, is found another annotation supporting the rule that peace officers are liable for injury to property.

In *Antin* v. *Union High School Dist. No. 2, etc.*, 130 Or. 461 [280 Pac. 664, 66 A. L. R. 1271], the Supreme Court of Oregon held as follows: "A public officer is responsible to a private party for his own negligent or wrongful acts when acting in the scope of his authority."

In 23 Cal. Jur., page 323, the text reads: "A sheriff is answerable for the wrongful acts of his deputy, committed under color of his office, and in the pretended discharge of his duty, for, as has been seen, the acts of a deputy within the scope of his duties are considered in law as those of the principal." The rule, of course, likewise applies, but where the principal is liable for the wrongful acts of a deputy, the deputy himself would be personally liable for his tort. In all such cases the question of good faith on the part of the officer is wholly immaterial where the plaintiff is not asking for any wilful or punitive damages. This principle is succinctly set forth in 21 Cal. Jur., page 908, as follows: "It is elementary that a public officer is liable to respond in damages to one specially injured by his neglect, or refusal to perform, or by his negligent performance

of an official ministerial duty to the extent of such special injury, regardless of intentions, whether good or bad.''

Other cases might be cited, but the annotations found in A. L. R. to which we have referred establish the liability of a public officer for his wrongful acts, or where he acts without, or in excess of his authority. In this case damages were allowed only to the extent of the property damage suffered by the plaintiffs. The good faith or bad faith of the appellants becomes wholly immaterial.

What we have said disposes of all the questions tendered for consideration, and renders unnecessary a review of the many cases cited by the appellants which are not controlling here. The damages allowed are amply supported, though in relation to the use of the truck, the testimony is conflicting. Under such circumstances the allowance cannot be disturbed.

The judgment is affirmed.

Thompson, J., and Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 8, 1933, and the following opinion then rendered thereon:

THE COURT.—The record shows that judgment was entered in this case only against the persons who individually participated in the conversion of the property belonging to the plaintiffs. No question of *respondeat superior* is involved. From which it follows that the cases cited in appellants' petition for a rehearing have no bearing upon this case. Nor is there any question raised as to the liability of officers for illegal arrests. The plaintiffs in this case were not arrested. The only issue presented concerned the property belonging to the plaintiffs and converted by the defendants against whom judgment was entered.

The cases cited in the opinion heretofore rendered were in some instances cases where the liability of a superior officer was involved, but those cases were cited simply to show the responsibility of an officer wrongfully converting property, not for the purpose of intimating that the liability of any principal was concerned. Such cases are pertinent because if the circumstances are such as to show that a superior

officer was involved, a deputy who acts for the superior officer would likewise be liable. In the instant case it appears that deputies alone acted. Hence, their liability is individual and personal.

The appellants' petition for rehearing apparently has overlooked the line of demarkation in the cases, and were led to the conclusion that the court was laying down a rule as to the liability of principals.

The petition for rehearing is denied.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 4, 1934.

Shenk, J., and Curtis, J., dissented.