[Crim. No. 2327. First Dist., Div. Two. June 8, 1945.]

THE PEOPLE, Respondent, v. CHASKEL CHAIT et al., Appellants.

Cannon & Callister, David H. Cannon, Ben L. Blue, Maurice Gleason, Edward S. Cooper, John L. Fleming and John Boyce-Smith for Appellants.

Robert W. Kenny, Attorney General, David K. Lener, Deputy Attorney General, Ralph E. Hoyt, District Attorney, and Cecil Mosbacher, Assistant District Attorney, for Respondent.

NOURSE, P. J.—The appellants appeal from judgments of conviction on all counts of an indictment containing 10 counts of grand theft, two counts of violation of section 18 of the Corporate Securities Act [Stats. 1917, p. 673, as amended; Deering's Gen. Laws, Act 3814], and one count of conspiracy (alleging overt acts committed in the course of the conspiracy to effect its object) to defraud persons of money and property by false promises with fraudulent intent not to perform such promises, a violation of Penal Code, section 182(4). They also appeal from the orders denying them a new trial and probation. The cause took more than 10 weeks in trial; the transcript of the evidence on file herein consists of 16 volumes, with a total of 5,481 pages of testimony. Each of the defendants was given 10 consecutive sentences on counts 1 to 10 and concurrent sentences on the remaining three counts.

The activities of the defendants upon which the charges in the indictment were based consisted in the sale to various individuals of fractional lots of land upon the representation that they were either proven oil lands, were located in a proven oil district, or that negotations were then pending with major oil companies operating in the district, and that leases would

be made with these companies by virtue of which the purchasers would receive large bonuses or royalties and a comfortable income.

The witnesses for the state had had dealings with Hoytt, with Williams, with Singer, with Buchbinder and with Weil, either singly or with two or more of the defendants. In 1938 Hoytt and his associates were selling small acreages of a tract of land in New Mexico called the Pajarito Grant. This land was of little value for any purpose but was represented by Hoytt and his agents as prospective oil land, in which over $100,000 had been spent in drilling operations. From 1938 through 1943 the appellants continued to sell tracts of land in the Pajarito Grant and in Kern, Tulare and Kings Counties in California. One or two of the appellants would call on a prospect, build up appellant Hoytt as a wealthy, educated oil man who had conducted many charities and was interested in helping the poor. The prospect would be sold a $1\frac{1}{2}$ or two-acre tract of land for many times its value, on the representation that the land was proven oil land and that Hoytt was negotiating for a lease with several major oil companies who would pay bonuses of several hundred dollars per acre, plus a royalty on oil produced. In truth no major oil companies were negotiating for the lease of any of these tracts during the time covered by the indictment. The buyer would later be approached by one or more of the appellants with the statement that the oil companies refused to lease unless the buyer owned a larger tract and had a deed; and that the owner must have paid the entire price in order to get a deed. Those who paid the price demanded were often given deeds to land other than that described in their purchase agreements without notice or explanation to the purchaser. The purchase agreements were in most cases on a form approved by the Real Estate Commissioner and had a report of the Real Estate Commissioner printed on the reverse of the form, stating that the land was being sold only for speculative purposes and that the report was not an approval or disapproval of prices charged. The buyers either did not read the report, or were told that it was a mere form, or that it was a state approval of the project. Some of the buyers were told that a syndicate was to be formed, of which Hoytt and his father were to be parties, and that the buyer on buying additional land would be let into the syndicate.

As a part of their plan to deceive the prospective purchasers the defendants worked upon a uniform plan or formula, an important part of which was the creation of a picture of Hoytt as a man of high integrity, ability, and financial standing. A review of the evidence relating to these circumstances is fairly stated in respondent's brief, from which we quote in part:

"The victims were told that S. W. Hoytt was the son of an English father and Spanish mother; that he was born in Santa Clara Valley; that his father was a millionaire; that he was an only child and heir to his father's millions; that Hoytt was a geologist; a university graduate who spent his time in the oil fields; that he understood the oil business from the ground up; that he had drilled wells not only in California but in many places including a number of foreign countries; that he owned a number of producing oil wells in California; that he was constantly flying back and forth to Washington to advise government officials about oil conservation and to negotiate leases with major oil companies; that the firm of S. W. Hoytt Company was founded by S. W. Hoytt, Sr., who, now a man between 80 and 90 years of age, was still actively engaged in the oil business; and still doing business on the same corner where he had first established the company 50 years ago.

"In order to make aged victims think that Hoytt was particularly interested in elderly people and solicitous of their welfare, the prospective purchasers were told that appellant Hoytt was very devoted to his father; that he always spent the holidays with him even though it necessitated his crossing the continent to do so; that appellant Hoytt was a very generous and philanthropic man who contributed liberally to all charitable projects; that because of his wealth it was not necessary for him to work, but having retired once he decided to go back into the oil business and help out working people by offering them the opportunity to participate in the fabulous returns to be gained from these proven oil properties.

"Where the intended victim was an ardent member of a particular religious group, Hoytt and his confederates would frequently represent that they were devout members of the same faith. Thus, to a Seventh Day Adventist Hoytt and Singer represented themselves to be members of that church and represented that Hoytt's father was one of the leaders of

that denomination in Los Angeles. To a Catholic Hoytt stated that he was a Catholic and that he had been to mass that morning. On one occasion he said he had dined with the Pope.

"The victims were also told that Hoytt was an unmarried man for the purpose of establishing a somewhat romantic relationship with his clients who were either widows or spinsters past middle age. If the client were too old to be interested in Hoytt personally she was told that she resembled Hoytt's mother and that was the reason he was taking a special interest in her welfare, and Hoytt asked some of his victims if he might call them 'mother.' To build up and foster this personal relationship victims were sent gifts, most often a purse which carried the suggestion that it would soon be filled with money obtained from the oil land. Such gifts at times were purportedly sent by Hoytt's father.

"The true facts concerning Hoytt's personal history were briefly these:

"He was born in Kiev, Russia, in 1894 or 1895 and was the youngest of ten children. His name was Chaskel Chait. His father, Aaron Chait, died in Kiev, Russia, in 1909 and never came to the United States. In 1912 Hoytt came to the United States with his mother and then took the name of Sam Hoit or Sam Hoytt. In August, 1942, he became an American citizen by naturalization and at that time the court authorized him to use the name of Sam W. Hoytt.

"Hoytt was not a geologist. He was not a university graduate and even had difficulty writing the English language. Hoytt did not come to California until 1931. He first worked as a real estate salesman for the Norins Realty Company selling Pajarito Grant lands and in 1933 worked for the appellant Williams who was operating as the Federal Realty and Development Company. Hoytt worked as a real estate salesman on various questionable promotional schemes until 1938 when he obtained a real estate broker's license, and began operating as the S. W. Hoytt Co. These various appellants and others then started working for him. In November, 1928, Hoytt married Lillian Epstein, to whom he was still married at the time he was indicted by the Grand Jury of Alameda County.

"The record shows that neither Hoytt nor any other of these appellants ever drilled an oil well and that Hoytt never owned an oil well in the State of California. There was no evidence that he had ever owned an oil well in any other place.

The record further indicates that up to the time of the indictment Hoytt had no negotiations with any major oil company for a lease of any land owned by him in the State of California for a bonus of $300.00 or $1500.00 per acre or any other price, except that he did lease 2½ acres to the Standard Oil Company for a period of three years for a total sum of $25.00. . . . Representatives from each of these (the major oil) companies, with the exception of Standard Oil, testified that neither Hoytt nor any other one of these appellants ever had negotiations with his company for the leasing of any of the lands referred to in these proceedings at any price prior to the date of the indictment.''

In their appeal from the judgment four separate briefs have been filed by appellants but each appellant has adopted by reference the briefs filed on behalf of the others.

■ When the cause was called for oral argument the appellants for the first time raised the point that the first 10 counts of the indictment failed to plead a criminal offense because all the ''material elements'' of the offense for which they were tried were not pleaded. *People* v. *Walther*, 27 Cal. App.2d 583 [81 P.2d 452], and a statement found in 12 California Jurisprudence, page 464 (published in 1923), are relied on. Appellants overlook the amendments to section 952 of the Penal Code which were enacted in 1927 for the express purpose of eliminating the objections here made. The same error was made by the court in the Walther case and the error was conceded by the same court in *People* v. *Dunn*, 40 Cal.App.2d 6 [104 P.2d 119], where it was said that in the Walther case the court had failed to take into consideration the provisions of the amendment that the information or indictment ''may be in the words of the enactment describing the offense.'' But the appellate court in the Walther case also overlooked the clear and comprehensive opinion of the Supreme Court in *People* v. *Fewkes*, 214 Cal. 142 [4 P.2d 538], where the purpose and the effect of these amendments to the Penal Code is fully explained and numerous authorities to the same purport were cited. Since the same appellate court declined to follow the rule of the Walther case in its later decision, and since it is contrary to all other authorities, we must assume that it can no longer be regarded as an authority.

■ In the opening brief of appellant Singer, he expressly limited the attack upon the indictment to the eleventh count.

The gist of this count is the charge that defendants conspired to defraud persons of money and property by false promises that defendants would consummate leases with oil companies which would pay royalties and bonuses, that such promises were known to be false, and were made with the fraudulent intent not to perform them. These allegations are followed by designation of the separate overt acts committed in the course of the conspiracy. It is argued that the allegations are defective because they do not charge that appellants knew the promises were false at the time they were made, and *People v. Campbell*, 1 Cal.App.2d 109 [36 P.2d 198], is cited as authority. In that case the two defendants were charged with conspiracy to obtain a quantity of hay from another for which Campbell would deliver his check in payment. The indictment charged that ''defendant Campbell'' knew he did not have sufficient funds to cover the check which was thereafter delivered and that ''defendant Campbell's'' promise to pay was made with a fraudulent intent not to perform. The appellate court held that since it was not charged that the other defendant knew or intended that the check would not be good the indictment failed to charge a conspiracy to obtain property by false promises with fraudulent intent not to perform them. The same cannot be said of the indictment before us which pleads the promises which were agreed to be made, that they ''were to be and would be false and known to said defendants to be false,'' and would be made by ''said defendants'' with fraudulent intent not to perform the same.

Appellants also argue that the indictment in respect to the eleventh count is faulty because it does not allege the value of the property taken so that it may be determined whether the offense is a felony or a misdemeanor. Appellants rely on *People v. Barnard*, 63 Cal.App. 562 [219 P. 756], which was decided before the Legislature in 1927 amended the Penal Code to eliminate many of the frivolous technicalities found in the decisions relating to criminal procedure. The gist of the opinion in the Barnard case is found at page 571: ''Where the punishment of a crime, as in the case of larceny or the obtaining of money or property by false pretenses, is made to depend upon the value of the money or property taken or obtained, the value must be stated in the indictment (*Woodring v. Territory*, 2 Ann.Cas. 857, note; 25 Cyc. 85; 25 C.J. 634).'' Here the gist of count 11 of the indictment is the

charge of conspiracy to sell certain persons interests in real property upon false promises and with fraudulent intent not to perform the promises. There is no substantive offense of defrauding persons of money and property upon promises made with a fraudulent intent not to perform. Hence the indictment is to be tested in the view of section 952 of the Penal Code—whether it is sufficient to give the accused notice of the offense of which he is charged. Since under that section it is sufficient to charge the accused "in the words of the enactment describing the offense" the attack upon the indictment falls because it is "in the words" of section 182 of the Penal Code which includes in the definition of conspiracy "to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform such promises." For these reasons we conclude that the indictment states a public offense in all respects in harmony with the applicative statutes and decisions.

The appellants argue somewhat vaguely that if they had a fraudulent intent to obtain money or property by false pretenses then the first taking constituted a completed crime and each subsequent taking constituted a separate offense. Whether appellants infer from this that there was some defect in the indictment, or that they were placed in double jeopardy, or that there was some error in the admission of evidence cannot be ascertained from the briefs. Manifestly if the appellants fraudulently obtained money or property on 10 different dates from 10 different persons as alleged in the first 10 counts of the indictment they committed 10 separate offenses. (*People* v. *Caldwell*, 55 Cal.App.2d 238 [130 P.2d 495].) But they were also charged in the eleventh count with conspiracy to obtain money and property from others by false pretenses, and conviction on the first 10 counts does not foreclose a conviction on the conspiracy charge. (*People* v. *Hoyt*, 20 Cal.2d 306 [125 P.2d 29].)

The argument is made on behalf of appellant Singer that his conviction on the conspiracy charge was error because of his testimony that he terminated his employment with S. W. Hoytt on August 5, 1942, after he had made his last sale to Johansen. The self-serving declaration of the appellant's intention to withdraw from the conspiracy is of no evidentiary value. His testimony that he told the victim that he was going to withdraw was directly denied by that witness.

If one involved in a conspiracy desires to withdraw therefrom he cannot escape responsibility by intent alone. Some affirmative act bringing home the withdrawal to the knowledge of his confederates is necessary, otherwise the conspiracy once established will be presumed to continue until the ends are accomplished or its abandonment is established. (*People* v. *Tinnin,* 136 Cal.App. 301 [28 P.2d 951]; *Coates* v. *United States* (C.C.A. 9th) 59 F.2d 173. See generally 5 Cal.Jur. 523.)

█ Upon a similar line of reasoning this appellant argues that the evidence was insufficient to convict him on the first count because the money was obtained after his "withdrawal" from the conspiracy and because the testimony of the victim that this appellant accompanied Hoytt when the transaction was completed is hearsay. Neither point has any merit. The testimony that he accompanied Hoytt at the very time the sale was made was direct testimony of a fact material to the issues. The same testimony negatives his claim of a previous withdrawal from the conspiracy. It was sufficient to show that the act charged in count 1 as a separate offense was participated in by this appellant while an active member of the conspiracy charged. This appellant's argument that since the transactions upon which the sixth and seventh counts rest occurred after his "withdrawal" the evidence is insufficient to convict him on those counts falls for the same reason.

█ The next point raised by appellant Singer is based upon a misconception of the record. He states that the only transaction with which he was connected by the evidence was the sale to Johansen. But the evidence is that he accompanied Hoytt, or one of the other conspirators, on numerous other occasions and joined with his associate in the representations made, though the other party was the active one in making the sale. It is axiomatic that once a conspiracy is established it is unnecessary to prove that each conspirator personally participated in each of the several overt acts performed in furtherance of the conspiracy. (*People* v. *Breitenstein,* 111 Cal.App. 746 [296 P. 87].) █ Nor is it necessary to prove in a case of this type that the false representations made were "the sole inducing cause" of the owner parting with his money or property. (*People* v. *Steffner,* 67 Cal.App. 1 [227 P. 690]; *People* v. *Whiteside,* 58 Cal.App. 33 [208 P. 132]; 35 C.J.S. 664.) █ Directing his attack particularly to the ninth count this appellant argues that the evidence is insufficient to show that he knew the representations were

false. But he testified that he had been engaged for 15 years in selling promotional land schemes of this type, had been so engaged by Hoytt in these sales of "potential" oil lands, and knew there was nothing in the exhibits upon which he said he relied which would cause him to believe that any of the false representations might be true.

The appellant Singer makes a general attack upon the evidence relating to counts 2, 3, 4, 5, 8 and 10, arguing that the evidence is insufficient to support the verdicts in that it does not show that he had a mutual understanding with his coconspirators to commit the unlawful acts relied on. Authorities holding that such proof is essential are cited and portions of the testimony of several witnesses are referred to. It is not necessary to say more than that the authorities support the general rule and that the testimony quoted is incomplete. At the outset it is conceded that an unlawful conspiracy may be proved by circumstantial evidence. (*People* v. *Goldaber,* 17 Cal.App.2d 195, 197 [61 P.2d 975] ; *People* v. *Bucchierre,* 57 Cal.App.2d 153, 163 [134 P.2d 505].) The circumstances supporting the inference that each of the conspirators had formed the mutual intent to commit the unlawful acts alleged are too numerous to recite in detail. It is sufficient to refer to the uncontradicted evidence that all of the appellants had been engaged for more than five years in selling to the public practically worthless lands upon the false representations that they were proven oil lands, or that they were of such potential value that leases *would be made* with established oil developing companies which would bring large returns to the purchasers. The evidence was that before the sales were made to the parties named in the indictment the appellants knew that previous sales made by them had proved failures, and that, notwithstanding this knowledge, they continued their operations with the same misrepresentations, the same technique, and in the same manner, always selecting as their customers persons of advanced years and women known to be without business experience. The scheme of operations in every instance followed a uniform pattern of approach to and dealings with each customer, a pattern so uniformly followed by each of the appellants that the jury could not have avoided the conclusion that all the conspirators had the mutual and common understanding to engage in the conspiracy in the manner and for the purposes alleged in the indictment.

 The appellant Singer cites section 1110 of the Penal Code and argues that the testimony of each of the victims covering the false representations made was not corroborated. For this purpose the testimony of all the purchasers must be taken into consideration. This testimony which shows the use of the uniform plan and pattern and the practically uniform statement of the "false pretense" was sufficient. The accepted rule is clearly stated in *People* v. *Wymer,* 53 Cal.App. 204, 206 [199 P. 815], where the court said: "In this class of cases the circumstances connected with the transaction, the entire conduct of the defendant, and his declarations to other persons are proper matters for the consideration of the jury, and may be looked to to furnish the corroborative evidence contemplated by the law." This was followed with approval in *People* v. *Whiteside,* 58 Cal.App. 33, 41 [208 P. 132], and *People* v. *Helmlinger,* 69 Cal.App. 139, 142 [230 P. 675].

 Under the heading "Errors of the Court" the appellant Singer argues that testimony of acts and declarations of coconspirators out of the presence of this appellant was inadmissible. *People* v. *Busby,* 40 Cal.App.2d 193 [104 P.2d 531], and similar authorities are cited to the point that the existence of the conspiracy must be proved by independent evidence before acts and declarations of a coconspirator may be admitted. The respondent does not question the rule of the cited cases, but does resist the appellant's assertion that "The record is devoid of any evidence of a conspiracy." Reference to the portions of the evidence which have heretofore been stated is a sufficient answer to appellant's contention.

 The first instance of claimed error to which this appellant directs attention occurred during the examination of Adele Anderson who was testifying for the state in reference to the first count of the indictment under which all the defendants were charged with grand theft. The testimony of this witness was admissible for the purpose for which she was called. The fact that some of her testimony tended to prove a conspiracy did not affect its admissibility. It was impossible of course for the state to prove each of the acts charged in the first 10 counts before it proved the others. The order of proof is always a matter for the trial court to control. (*People* v. *Breitenstein,* 111 Cal.App. 746, 749 [296 P. 87].) If in proving the 10 separate acts of grand theft the state also proved a conspiracy on the part of all the defen-

dants to commit the same separate or similar overt acts the order in which the proof is made is immaterial. Hence, the rule of the cases upon which this appellant relies does not cover a case of this type where the circumstances of the commission of the separate acts are of the same character as the circumstances upon which the state relies as the indirect evidence from which the existence of the conspiracy might be inferred. Those cases relate to instances where direct evidence of the conspiracy is available and the effect of the rule is that in such type of case the state may not withhold the direct proof of the conspiracy while offering evidence of acts and declarations of the alleged conspirators. The absurdity of the application of the rule for which this appellant contends to this type of case is apparent. The five defendants usually worked in pairs under a uniform pattern. Two of them approached the prospect and laid the foundation for a sale. Sometimes one of them, sometimes both, and sometimes one of the other conspirators returned and made the actual sale. Evidence tending to prove the charge of grand theft as to one necessarily included the activities of the other and all this evidence tended to prove the conspiracy. Hence the evidence of these circumstances was properly admitted.

 This appellant argues that the court erred in refusing his request that the jury be instructed "at this time, not at the close of the case" that no evidence was binding against him until a conspiracy had first been proven. He cites *People* v. *Doble,* 203 Cal. 510 [265 P. 184], and *People* v. *Gonzales,* 20 Cal.2d 165 [124 P.2d 44]. Neither is in point and no authority which we have found supports the position. The instructions which were given at the close of the trial fully covered the point and were given at the proper time.

 There was no error in the admission in evidence of the documentary evidence taken from the files of the S. W. Hoytt Company. The documents bore directly upon the charge of conspiracy, in many cases were the means by which the offense was committed, many of them were written by appellant Singer and tended to prove his participation in the conspiracy. The case of *People* v. *Zoffel,* 35 Cal.App.2d 215 [95 P.2d 160], has no application.

 This appellant's assignment that the evidence is insufficient to sustain the conviction on the conspiracy count is in effect an argument that the evidence was too much and too

soon. On the premise that all the evidence tending to prove the charges of grand theft found in the first ten counts also tended to prove the charge of conspiracy found in count 11 this appellant argues that the state split the one conspiracy into eleven and therefore the evidence disclosed that several conspiracies were committed rather than the one charged in count 11. The argument rests upon a misunderstanding of the charging parts of the indictment. The first ten counts charge grand theft from eight separate individuals. The eleventh count charging conspiracy specifies ten separate overt acts committed in relation to six separate individuals only two of whom were named in the former counts. All the evidence offered in support of the first ten counts was admissible for the purpose of showing the "plan, scheme, design and guilty knowledge" of the several defendants and the fact that when this evidence was piled on to the evidence of a conspiracy to obtain money and property by false promises with no intent to perform them it was substantial and pertinent evidence tending to prove both charges does not make such evidence inadmissible upon any reasonable theory. To restate the proposition when the evidence received to prove the general conspiracy discloses that more "overt acts" were committed in the conduct of the conspiracy than those alleged in the indictment it cannot be said that the evidence is "insufficient" to prove the conspiracy charged because such evidence proves that the conspiracy was in fact more widespread in its operations than was charged in the indictment. If the evidence as offered was irrelevant to the issues tried that would be ground for a different objection from the one here raised. But since the evidence here referred to was admissible to prove the general plan and guilty knowledge of all the conspirators it was likewise admissible to prove their participation in the conspiracy charged in the eleventh count.

If this appellant intends by his argument to imply that there is some sort of second jeopardy or double punishment for the same offense the answer is found in *People* v. *Hoyt,* 20 Cal.2d 306, 317 [125 P.2d 29], where the Supreme Court said: "The crimes of criminal conspiracy, robbery and murder here involved are separate and distinct offenses. The test is the identity of the offenses as distinguished from the identity of the transactions from which they arise. A defendant may be convicted of two separate offenses arising

out of the same transaction when each offense is stated in a separate count and when the two offenses differ in their elements and one is not included in the other. (*People* v. *Martin,* 114 Cal.App. 392 [300 P. 130] ; *People* v. *Venable,* 25 Cal.App. 2d 73, 74 [76 P.2d 523].) ''

The assignment of error that one of the witnesses was permitted to testify that she was deeded property different from that described in her contract of sale is not substantial. If it were it would reach the testimony of several other witnesses. That transaction was not unusual as the evidence as a whole disclosed that many of the other victims had the same experience and that it was a part of appellants' general scheme of defrauding the purchasers to give them deeds to worthless lands which were not even mentioned to the purchasers during the negotiations.

The criticism of the conduct of the trial judge is wholly without merit. It would serve no purpose to cite the portions of the transcript referred to. It is sufficient to say that in each instance the trial judge was merely admonishing the witness to testify to facts without equivocations and without the expression of opinion or conjectures.

The assignment of error in refusing to give fourteen instructions listing them by number only, and without any statement of their context or any argument in support of the assignment does not call for consideration. (See 2 Cal.Jur. 731.)

The appellant Weil, adopting all that is said in the brief of appellant Singer, raises the question whether there was error in the admission of parol evidence at variance with the written contracts. He cites and relies upon *People* v. *Carter,* 131 Cal.App. 177 [21 P.2d 129], as giving comfort to the proposition that innocent persons should not be made the victims of careless or vindictive individuals through relaxation of the settled rules of evidence. The rule is settled and of long standing that the rules of evidence in civil cases as to direct or collateral attack upon a contract do not apply in cases of this type. (*People* v. *Martin,* 102 Cal. 558, 566 [36 P. 952].) The People prosecuting for a crime committed in relation to a contract are not parties to the contract and are not bound by it. They are at liberty in such a prosecution to show the true nature of the transaction. (*People* v. *McEntyre,* 32 Cal.App.2d Supp. 752, 760 [84 P.2d 560] ; *People* v. *Jones,* 61 Cal.App.2d 608, 620 [143 P.2d 726].)

█ This appellant contends that the trial court erred in the admission in evidence of corroborative and cumulative evidence showing the criminal intent of the conspirators. That the evidence was competent and relevant cannot be denied. But it is argued that there was so much of it, and that some of the witnesses who had been defrauded were so aged, and in such poor financial straits, that it all had a bad effect upon the jury. No authorities are cited to the point raised. When the evidence was tendered the trial court was required to rule whether it was admissible on legal grounds, and in this case there was no error.

█ Finally this appellant argues that he was merely a collector for the other parties and therefore could not be a party to the conspiracy. All the reliable evidence is to the contrary, but, even if it were true that he was merely a collector for the other conspirators, the jury could conclude that his activities in that capacity were an important and necessary part of the general conspiracy.

█ The appellants Goldberg and Buchbinder direct their attack upon the convictions for violating the Corporate Securities Act and upon a number of the trial court's instructions. Their argument on the first point is that the sales which they made were single sales of the fee title to land and were not sales of "securities" within the contemplation of the act. But the undisputed evidence is that the lands were not sold as farming land or for grazing purposes but as a speculative interest in a promised "dividend" from pending leases on "proven oil land." The case is in line with *Securities & Exchange Com.* v. *Bailey,* (S.D. Fla.) 41 F. Supp. 647, where similar sales were made upon representations that the purchasers would participate in a "development" contract of a large tract of land to be used in the growing of tung trees. In holding that the sales came within the purview of the Securities Act the court said: (p. 650) "An 'investment contract,' as contemplated by the Act, is one which contemplates the entrusting of money or other capital to another, with the expectation of deriving a profit or income therefrom, to be created through the efforts of other persons. . . . In essence, what the defendants are really offering, and certainly what the average purchaser is really buying is, not land for its intrinsic value, but a producing tung grove as a source of income, without which he would not be interested in purchasing the land." (To the same effect is *Domestic & Foreign*

*Pet. Co.* v. *Long,* 4 Cal.2d 547 [51 P.2d 73] ; *People* v. *Jackson,* 24 Cal.App.2d 182 [74 P.2d 1085] ; *People* v. *Daniels,* 25 Cal. App.2d 64 [76 P.2d 556] ; *People* v. *Yant,* 26 Cal.App.2d 725 [80 P.2d 506] ; *Moore* v. *Stella,* 52 Cal.App.2d 766 [127 P.2d 300].)

 The same appellants criticize a number of instructions given by the trial judge upon his own motion. The objection is not that they contain an incorrect statement of the rules of law, but that they fail to contain all the admonitory language such as "If you are satisfied from the evidence" and "If you find from the evidence in this case." The five instructions listed defined a conspiracy in general terms, explained the necessity of knowledge of the conspiracy by each party, the conditions of liability of each, the necessity of proof of at least one overt act, and the circumstances under which one member of a proved conspiracy is bound by the acts and declarations of his coconspirators, and when evidence of such acts and declarations becomes inadmissible.

It is not clear why these appellants raise the point for decision. It is so obvious that the instructions follow well established rules of law that no criticism is made of the soundness of the legal principles they contain. All that these appellants contended for, and more, is found in the instruction reading:

"The court has given you instructions embodying such rules of law as may be necessary to assist you in arriving at a verdict. As to some of these instructions, their application depends upon the light in which you view the evidence.

"The fact that the court has given you instructions as to particular rules of law must not be taken by you as an indication that such rules are necessarily applicable. Where there is a conflict of evidence, the question as to whether a particular rule of law is applicable depends frequently and solely upon the conclusion as to what the facts are, and the jury are the sole judges of the facts.

"If any instruction is applicable only if a particular situation or state of facts exists, and if you find that no such situation or state of facts exists, then you should not take such instruction into consideration in your deliberations."

 The appellant Hoytt assigns error in the use in evidence of papers and documents which had been seized under a search warrant at his place of business.

The circumstances upon which the argument is based are

that the articles were seized under a search warrant issued by a judge of the superior court upon an affidavit which charged the crimes of grand theft and a violation of section 182 of the Penal Code, that the articles were described as "Forms, reports, circulars, . . . maps, letters, memoranda, books, etc.," that they were used and were intended to be used by appellants as a means of committing other and similar crimes. Appellants state in their brief that "By far the largest amount of documentary evidence offered and received in this prosecution was taken under the search warrant . . ." and that the conviction could not have been obtained without that evidence. In all fairness appellants should concede that such documentary evidence as was received was competent and relevant evidence.

Appellants made several unsuccessful attempts to recover the books and documents by proceedings in the municipal court, in the superior court, and in the District Court of Appeal, and filed an application for a writ of prohibition in the Supreme Court to restrain the trial of this action on the ground that the search and seizure was illegal. This application was denied.

It is the settled rule in this state that the question of the legality of a search and seizure of personal property cannot affect the question of the admissibility of the property in evidence in a criminal case and that it cannot be enquired into on an appeal from a conviction. (*People* v. *Mayen,* 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383]; *People* v. *Gonzales,* 20 Cal. 2d 165 [124 P.2d 44]; *People* v. *Beilfuss,* 59 Cal.App.2d 83 [138 P.2d 332].) In the Gonzales case the Supreme Court states the conflicting federal and state rules, with authorities supporting each, in clear and concise language. We quote (pp. 168-9):

"The Fourth Amendment to the Constitution of the United States prohibits unreasonable searches and seizures by federal officers. Pursuant to this mandate the federal courts forbid the introduction in court of evidence obtained by an illegal search or seizure if a timely motion for its exclusion is made by the accused. (*Byars* v. *United States,* 273 U.S. 28 (47 S. Ct. 248, 71 L.Ed. 520]; *Go-Bart Importing Co.* v. *United States,* 283 U.S. 344 [51 S.Ct. 153, 75 L.Ed. 374]; *Gouled* v. *United States,* 252 U.S. 298, 302 [41 S.Ct. 261, 65 L.Ed. 647]; *Silverthorne Lumber Co.* v. *United States,* 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319]; *Boyd* v. *United States,* 116 U.S. 616

[6 S.Ct. 524, 29 L.Ed. 746] ; *Weeks* v. *United States,* 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed. 652] ; *Nardone* v. *United States,* 308 U.S. 338 [60 S.Ct. 266, 84 L.Ed. 307] ; *Ex parte Jackson,* 96 U.S. 727, 733 [24 L.Ed. 877] ; *Amos* v. *United States,* 252 U.S. 313 [41 S.Ct. 266, 65 L.Ed. 654] ; *Agnello* v. *United States,* 269 U.S. 20 [46 S.Ct. 4, 70 L.Ed. 145].) The California Constitution contains an identical provision (Cal. Const., art. I, sec. 19), but the accepted rule in this state, as in many others, permits the introduction of improperly obtained evidence on the ground that the illegality of the search and seizure does not affect the admissibility of the evidence. (*People* v. *Mayen,* 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383] ; *In re Polizzotto,* 188 Cal. 410 [205 P. 676] ; *People* v. *Le Doux,* 155 Cal. 535 [102 P. 517] ; *Herrscher* v. *State Bar,* 4 Cal.2d 399 [49 P.2d 832]. See cases cited in 88 A.L.R. 348.) The defendant may have civil and criminal remedies against the officers for their illegal acts (see Pen. Code, § 146; *Silva* v. *MacAuley,* 135 Cal. App. 249 [26 P.2d 887, 27 P.2d 791] ; *Ryan* v. *Crist,* 23 Cal. App. 744 [139 P. 436] ; 15 So.Cal.L.Rev. 139, 141 et seq.), but the state is not precluded from using the evidence obtained thereby.''

 This appellant complains of the refusal of the trial judge to give certain proposed instructions. The first two referred to contained lengthy extracts from the State Real Estate Act [Stats. 1919, p. 1252; Deering's Gen. Laws, Act 112] relating to the licensing of real estate brokers and the duties of the Real Estate Commissioner in relation to the supervision of such brokers and agencies, his right to inspect lands to be offered for subdivision, the publication of his report and similar matters which had no possible bearing upon the issues being tried. The only conceivable purpose of the proposed instructions is that they were intended to convey to the jury the impression that some of the appellants depended upon some of the reports of the commissioner as showing that the lands sold were "potential" oil lands. But all the appellants testified that they did not make any representations to the purchasers as to the possibilities of oil and that they did not represent to any one of these purchasers that leases with adjoining oil companies were being negotiated for large royalties and bonuses. Such being the case the proposed instructions had no bearing upon any of the issues being tried.

 It is also suggested that there was some sort of error

in the refusal to give two other proposed instructions. But the appellants have not argued the point and have not said what error they have discovered. The reviewing court does not search for error but assumes that the judgment is sound unless error is disclosed by the parties interested. (2 Cal.Jur. 731.)

This appellant gathers a number of charges under the general heading of ''manifest passion and prejudice.'' He lists as one instance the ''unlawfulness'' of the search and seizure which has heretofore been covered. He states that he was required to post unreasonable bail—without any reference to the record. ■ That ''unwarranted bitterness'' was shown by the district attorney in indicting him ''under his Jewish name of Chaskel Chait.'' The purpose of this objection is not apparent since several of the substantive offenses were shown to have been committed while this appellant was legally known as Chaskel Chait and before he was given legal permission to change his name to Hoytt. It is not disputed that this appellant was born in Kiev, Russia, and given the name of Chaskel Chait, that he came to this country in 1912 and at some time not disclosed in the record assumed ·the name of Sam Hoit or Sam Hoytt, that he was admitted to citizenship in August, 1942, by naturalization and was then given permission to use the name of Sam W. Hoytt. The indictment properly charged him under both names. If the former name was ''Jewish,'' as he now asserts, there is no evidence in the record that such fact was presented to the jury or that anything was done or said for the purpose of creating prejudice in the minds of the jurors because of that relation.

■ Equally untenable is the claim of ''passion and prejudice'' in the denial by the trial court of appellants' motion that the court reporter be ordered to furnish them a daily transcript of the trial proceedings. Section 269 of the Code of Civil Procedure requires the court reporter to transcribe from his note a record of the proceedings ''within such reasonable time after the trial'' as the court may designate. Whether, in a criminal case, these proceedings shall be transcribed daily and a copy furnished the defendant is a matter properly left to the discretion of the trial court. Where discretion is thus imposed the mere denial of the request of one of the parties is not evidence of passion or prejudice. If there was an abuse of discretion in this case it is incumbent upon the appellants to show more than they have done here.

■ No argument has been made in support of the appeals from the order denying probation and they should be treated as having been abandoned, and so dismissed.

The judgments and the orders denying the motions for a new trial are affirmed. The appeals from the order denying probation are dismissed.

Sturtevant, J., and Dooling, J. pro tem., concurred.