[Crim. No. 944. Fourth Dist. Dec. 22, 1953.]

THE PEOPLE, Respondent, v. MORTON L. BENNETT, Appellant.

Everett H. Smith for Appellant.

Edmund G. Brown, Attorney General, Alan R. Woodard, Deputy Attorney General, William O. Mackey, District Attorney (Riverside), and W. B. Gustaveson, Deputy District Attorney, for Respondent.

GRIFFIN, Acting P. J.—Defendant was charged in an indictment with grand theft. In one count is is charged that on November 21, 1951, he took more than $200 from Clemens Hinke, and in another count that on November 23, 1951, he took more than $200 from Mrs. Esther J. Evenson. The charges and conviction on each count were based upon claimed false representations made in the sale of stamp-vending machines as a business to be conducted in Riverside County. Defendant, who lived in Los Angeles, was a distributor of the machines for the Federal Dispenser Corporation. The evidence shows that the corporation never authorized the distributor defendant to guarantee any certain profit or income from such machines when making sales thereof, and never authorized him to grant exclusive areas to any individual purchaser.

On November 19, 1951, defendant ran and paid for an advertisement in the Riverside newspaper which advertisement had been composed by the corporation. It reads in part:

"'. . . Factory Distributor will select one MAN or WOMAN to independently OWN and OPERATE a route of
"U. S. POSTAGE STAMP DISPENSERS
"In Riverside and Vicinity

"THIS ADV. WILL APPEAR TODAY ONLY! If you are a RELIABLE, RESPONSIBLE person, this is an opportunity to become associated with UNCLE SAM's largest industry that will give you a STEADY, PROFITABLE income for the rest of your life.

"THIS IS NOT A 'GET RICH QUICK' BUSINESS . . . Distributor will make all necessary arrangements and assist the person selected in becoming established . . . please don't waste your time or ours, as we are going to close this area at once. . . .'"

In response to the advertisement, Clemens Hinke, a retired farmer, was interviewed by defendant. According to his testimony, defendant was first asked if he was representing the Government, selling postage stamps, and defendant replied: "It is a whole lot better deal than if you were working for the Government. It will make you more money." Hinke then testified that he then expressed disinterest in the deal and the defendant explained the operation of the machine by a personal demonstration and said: "If you work it good and tend to them weekly as you should, they will average $8.00 per month . . . each . . . profit"; that Hinke replied: "If 20 machines make me $50.00 per month I will be satisfied," and defendant replied: "You will be surprised. They will pay for themselves in six months if you stay by it and attend to business"; that

he then told defendant he would try ten of them but defendant refused and said since Hinke was "the only one selected for this county" he sold them only in lots of 20 at a time, but if, after he got started, he wanted another county, he could have San Bernardino County too, and he could then purchase any additional machines in lots of five; that defendant then told the complaining witness that defendant's brother had about 400 machines operating back East in Indiana and he "made a killing off these machines"; that he then told the complaining witness that he had others ready to sign up for the machines in that county and suggested that Hinke sign up immediately. He did so and defendant was given a check for $1,031.34, covering the cost of the project. The machines arrived a few days later and defendant came out to assist in securing locations for them and putting up brackets in which to place the machines in oil stations, garages, stores, etc. After locating about seven places defendant went back to Los Angeles and said he would return the next day. The complaining witness called him when he failed to return, and defendant then sent some other person to assist in securing locations. He arranged for these places but the complaining witness was compelled to put up the brackets and place the machines in operation. It was discovered that the complaining witness had to secure a license and pay a tax for this operation in Riverside, and paid the fee of $22. He was compelled to take some of the machines down because the proprietors of the premises wanted a commission on the sales. He thereafter discovered that there were many similar machines in operation throughout the city. He kept a record of the income from the machines he had out, and for the months they were out he found that the net profit per machine was only 29 cents instead of approximately $8.00 per month, as represented by defendant. He testified he endeavored, during this period, to contact defendant by phone and by letter to the company, but he was unable to do so; that he, in July, 1952, finally took the machines down and sold them for $200; that when he invested his money in purchasing them and the route he relied on the representations of defendant that he would have the exclusive right to sell the stamps and operate the machines in Riverside County and that he also relied upon the representation that these 20 machines would make a net profit of about $8.00 per month each.

The second count involved Mrs. Evenson and her blind husband. They answered the advertisement and were visited by

defendant only a few days after the Hinke sale. Their story of defendant's representations is quite similar to those made to the Hinkes. Defendant represented to them that they would be the only operators of these machines in Riverside County; that the closest machines were in Pomona, in Los Angeles County; that they, therefore, must take at least 20 machines, and if they wanted to buy more they could have San Bernardino County; that he explained the operation of the machines; that the nickel slot gave the customers 4 cents in stamps, with 20 per cent profit to the owner, and the ten-cent slot gave 9 cents in stamps, with 10 per cent profit to him; that since more nickels would be deposited than dimes, the average profit would be 17 per cent; that his brother in Indiana had 100 machines and was averaging $10 per machine per month; that the machines would make $8.00 profit per machine per month for them if cared for properly, even if located on a tree, and if moved to better locations they would make at least $10 per month per machine.

A contract was then signed for 20 machines and $1,031.34 was paid. Defendant agreed to locate the machines but they never saw him after the sale. After considerable effort defendant was located, and he sent out his agent to assist in locating places for the machines. This agent located only two places the first day because the complaining witness said at nearly every place they went there was a similar machine located. The agent left because of a claimed appointment. Before leaving he asked the Evensons to sign a list of some prospective locations where they thought they could themselves locate some machines. They did this and the agent then informed them that even though these locations might be fictitious he wanted them to sign the listing because he would then be able to collect $3.00 per location from defendant.

Thereafter, the Evensons put up five machines at some of the best locations, and after four months they were taken down. A recapitulation of the gross income therefrom was $22.35, and the average gross profit per machine was 18 cents per month.

To prove the falsity of defendant's representations as to the net income of similar machines, an independent operator of 55 such machines in the territory, who had been in business for five years, showed that his average net profit per machine per month in 1949 was 35 cents and in 1952 was 90 cents.

At the trial, defendant testified that when he contacted the Evensons on November 21st, he had already made the sale to the Hinkes a few hours earlier; that he did not tell them

about the Hinke sale. He denied making any statement about Riverside being given as an exclusive territory to either of them. He stated that he had been such a salesman for only six weeks and did not make any independent investigation as to what income these machines would bring, but took it from the company's brochure that it was possible to obtain from $4.00 to $8.00 profit per month from each machine. He denied generally making the statements referred to by the witnesses, although he testified at the time he made the sale to the Evensons he did not think they had any business handling these machines because Mr. Evenson was blind, but since Evenson thought he could, he did not oppose his suggestion. Defendant relied upon the written agreement signed by the parties as constituting the entire transaction between them.

It appears that the Federal Dispenser Corporation "folded up" a few months after these sales, and defendant left Los Angeles. The complaining witnesses were unable to contact defendant or anyone in regard to the machines. An indictment was returned by the grand jury in March, 1952. Defendant stated he left in his trailer for the East with his family around February or March of that year. He was notified in St. Louis about the charges made by Evenson and Hinke but did not return to California until a month later, and lived in an auto court in Los Angeles. He was later found and arrested in November, 1952, and claimed he did not surrender himself when he learned of the charges because he did not have any money.

It is his contention on appeal that the evidence is insufficient to support the judgment for the reasons: (a) that there is no evidence to support the finding that the stamp-vending machines purchased by either of the alleged victims were not worth the full amount paid per machine; (b) that neither of the complaining witnesses paid any extra consideration for the alleged exclusive territory or for the alleged minimum guaranteed earnings per machine; (c) that the evidence is insufficient to support the finding that defendant made any false statement, pretense or representation of either a past or existing fact as an inducement to either complaining witness to purchase the vending machines in question; (d) that the court committed prejudicial error in instructing the jury in reference to flight; and (e) in denying defendant's motion for a new trial.

The evidence shows that defendant made a considerable profit on the sales of these machines. About 20 of them

were sold by the Hinkes for $200. It was not the intrinsic value of the machines for which the complaining witnesses were negotiating. They were purchasing an exclusive business or route with the intention of making a profit from each machine as an integral part of such business, and if kept inactive, their intrinsic value, out of location, would not be the true value of the enterprise. The complaining witnesses paid a price of over $1,000 for this going business which it was represented would produce a net profit of about $8.00 per month per machine, and it does affirmatively appear that the complaining witnesses did not receive what they bargained for, as neither had received an exclusive business within the county, and neither party was able to realize any profit worth mentioning. Accordingly, there was sufficient evidence to show that each was defrauded out of an amount in excess of $200. This conclusion is supported by the decisions in *People* v. *Helmlinger*, 69 Cal.App. 139 [230 P. 675]; and *People* v. *Raines*, 66 Cal.App.2d 960, 962 [153 P.2d 424]. It is upon this theory that the prosecution based their case.

The doctrine of *caveat emptor* has no application to a criminal charge based on false representations. (*People* v. *Bellew*, 90 Cal.App.2d 801, 802 [203 P.2d 822].)

It is not necessary for the prosecution to show that either of the complaining witnesses paid any extra consideration for the exclusive territory or for the minimum guaranteed earnings per machine, as contended. That was supposed to be included in the sales price. Without the misrepresentations claimed, it is apparent that the sales would not have been consummated.

Some contention is made that under sections 1856 and 1860 of the Code of Civil Procedure, no evidence of any other agreement was admissible, since the agreement was reduced to writing and signed by the parties to be charged, citing *United Iron Works* v. *Outer Harbor Dock & Wharf Co.*, 168 Cal. 81 [141 P. 917]. A similar contention was made in *People* v. *Frankfort*, 114 Cal.App.2d 680, where it is said, at page 700 [251 P.2d 401]:

"The simple answer to this argument is that 'The people prosecuting for a crime committed in relation to a contract are not parties to the contract and are not bound by it. They are at liberty in such a prosecution to show the true nature of the transaction.' " (Citing several California cases.) See, also, *People* v. *Chait*, 69 Cal.App.2d 503, 519 [159 P.2d 445].

It is likewise argued that there was no sufficient cor-

roboration of the false representations under sections 1110 and 1111 of the Penal Code. It affirmatively appears that the false representations relied upon were corroborated by the husband and the wife of the respective complaining witnesses, as well as by the nature of the advertisement inserted in the paper indicating that an exclusive right to operate in Riverside and vicinity was to be given to "One MAN or WOMAN" and that "this area" would then be closed at once. We see no merit to this contention. (*People* v. *Helmlinger,* 69 Cal. App. 139 [230 P. 675]; *People* v. *Chait, supra; People* v. *Frankfort, supra,* and cases cited.)

There are cases cited by defendant which in effect hold that the criminal charge of obtaining money by false pretenses is not committed when the inducement is a promise to perform some act in the future, or is not predicated upon a false or fraudulent representation of a present existing fact or of a past fact. The cases cited are *People* v. *Daniels,* 25 Cal.App.2d 64 [76 P.2d 556]; *People* v. *Kahler,* 26 Cal.App. 449 [147 P. 228]; and *People* v. *Beilfuss,* 59 Cal.App.2d 83 [138 P.2d 332].

In this connection it is also argued that there is no evidence that defendant represented that the machines in question were in fact, at the time of signing the contracts, actually earning any specified sum per month per machine; that the only statement accredited to him was that in the future they were capable of earning $8.00 per month each if handled properly and placed in the right locations, citing *People* v. *Jackson,* 24 Cal.App.2d 182 [74 P.2d 1085]; and *People* v. *Walker,* 76 Cal.App. 192 [244 P. 94].

The prosecution here relied on two representations made by defendant: (1) that each of the purchasers was receiving as exclusive territory, the County of Riverside; and (2) that the machines would earn a minimum of $8.00 per month per machine. The evidence shows that in connection with their contract they were then and there receiving an exclusive right to operate the machines in Riverside County. This representation, in and of itself, if relied upon by the parties, was sufficient to support the jury's verdict. In *People* v. *Cravens,* 79 Cal.App.2d 658, at page 664 [180 P.2d 453], it was said:

"It is sufficient to prove any single false representation on which the victim relied . . . and the fact that false promises were likewise made is not important if there were also false representations of present or past fact which materially

contributed to the victim's parting with his property or money.'' (Citing cases.)

The evidence is sufficient to show that the parties relied upon this false representation and also that they relied upon the representation that the machines would make $8.00 per month per machine. ▮ There is authority to the effect that where defendant's opinions were given concomitantly with his statements of fact, which gave material support to his opinions and expressed to men who were ignorant of the true facts, there was actionable fraud, citing cases. (See, also, *People* v. *Davis*, 112 Cal.App.2d 286, 298 [246 P.2d 160]; *People* v. *Jones*, 36 Cal.2d 373, 377 [224 P.2d 353]; *People* v. *Mason*, 86 Cal.App.2d 445, 449 [195 P.2d 60]; and *People* v. *Gordon*, 71 Cal.App.2d 606, 624 [163 P.2d 110].)

▮ Here, defendant represented as a fact that his brother had operated 100 or more similar machines and was averaging $10 per month per machine. The jury was authorized to believe this testimony. Defendant testified at the trial, however, that his brother did not have that number of machines and had not operated them long enough for him to obtain any knowledge of their income. The victims had the right to believe that defendant had information as to the income of the machines in the past and that his statement as to their earning ability was as represented. Under these circumstances the cases above cited are applicable.

▮ The instruction given on flight in the language of section 1127c of the Penal Code was properly submitted to the jury under the evidence. It shows that defendant departed from the state a short time after the commission of the crime, and remained away until about the time he was apprehended. His contention is that he left because of his business and was seeking employment in the East. The weight and credence to be given his testimony in reference to his departure and the claimed reasons therefor were questions for the jury to determine. (*People* v. *Pianezzi*, 42 Cal.App.2d 270, 280 [108 P.2d 685]; *People* v. *Gregoris*, 70 Cal.App.2d 716, 720 [161 P.2d 568]; *People* v. *Leach*, 90 Cal.App.2d 667 [203 P.2d 544].) No different questions were raised on the motion for new trial. The order denying it was proper.

Judgment and order affirmed.

Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 20, 1954.