Filed 12/17/24  P. v. Brownell CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PAUL DAVID BROWNELL,<br><br>    Defendant and Appellant. | F087334<br><br>(Super. Ct. No. 22CMS0243)<br><br>**OPINION** |

### THE COURT\*

APPEAL from a judgment of the Superior Court of Kings County.  Michael J. Reinhart, Judge.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and Chung Mi Choi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*    Before Hill, P. J., Franson, J. and Snauffer, J.

**INTRODUCTION**

A jury convicted defendant Paul David Brownell of multiple counts of lewd acts upon a child, and the trial court sentenced him to nine years in prison. Defendant argues that the trial court erred in admitting evidence that he told a relative he was traveling to Long Beach when he actually left for Redding as evidence of flight and in instructing the jury that these facts could be used to support an inference of consciousness of guilt. We affirm.

**PROCEDURAL BACKGROUND**

The District Attorney of Kings County filed a second amended information on June 28, 2023, charging defendant with a forcible lewd act upon a child under age 14 (Pen. Code,[1] § 288, subd. (b)(1); count 1) and lewd acts upon a child (§ 288, subd. (a); counts 2, 3). Defendant pleaded not guilty.

A jury convicted defendant of all counts on June 29, 2023. The trial court sentenced defendant on December 13, 2023, to the upper term of five years in prison as to count 1 and consecutive two-year terms as to counts 2 and 3, for an aggregate term of nine years in prison. The court also reserved victim restitution (§ 1202.4, subd. (f)) and ordered defendant to pay $300 restitution and suspended parole revocation restitution fines (§§ 1202.4, 1202.45), $120 in court operations assessments (§ 1465.8), and $90 in criminal conviction assessments (Gov. Code, § 70373).

Defendant filed a timely notice of appeal on December 14, 2023.

**FACTS**

Laura S.[2] lived with her fiancé, eight-year-old daughter N.M.,[3] and four other children who were between the ages of 4 and 14 years at the time of defendant's trial in

---

[1]   Undesignated statutory references are to the Penal Code.

[2]   Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

[3]   N.M. was six years old in January 2022.

2.

June 2023.  Defendant, Laura's grandfather, had been living with them for six years as well.  He would care for the children while Laura and her fiancé were working.

Laura was home in bed on January 14, 2022, when she heard N.M. speaking to someone in Laura's bathroom through an open window.  When Laura asked, N.M. said that she was speaking with defendant, which upset Laura because N.M. had been told not to talk to anyone while in the restroom.  N.M. said that defendant had asked if she wanted him to sit and watch her.  Laura instructed N.M. that no one should watch her while in the restroom.  Laura asked N.M. if "anything like this" had happened before, and N.M. replied, "[N]o."  Laura asked N.M. if she was sure, and N.M. placed her hand on her private part.  Laura asked if defendant touched her, and N.M. said he touched her all the time.  N.M.'s eyes watered and she did not want to talk anymore.

Laura contacted her mother who instructed Laura to tell defendant to leave.  Laura told defendant what N.M. had said and ordered defendant to leave.  Defendant attempted to go to N.M. to speak with her.  Laura did not permit him to speak to N.M., and defendant went outside and told the other children of the accusations before he left the residence.  The next morning, Laura spoke with N.M. again and asked her whether defendant had touched her inside her pants, but Laura did not recall the response.  Laura called the police that morning.  Kings County Sheriff's Deputy Eddie Torres met with Laura.  Although Laura did not recall everything she said to Torres, he testified Laura advised him that N.M. said that defendant touched her inside of her pants.  N.M. also told Laura that defendant did not hurt her before she teared up, looked down, and said she did not want to talk anymore.

N.M. testified that defendant did weird things to her, but she did not remember.  Then she testified that defendant touched her in places that he was not supposed to touch.  Defendant touched her private part (near the part used to go to the bathroom) while she was on the couch with him.  N.M.'s cousin and two-year-old sister were also in the room.

N.M. was lying down near defendant, and he touched her private part with his hand over her clothes and moved it around. N.M. felt weird and uncomfortable.

N.M. also testified that she touched defendant's private parts one time by accident while lying down on the couch with him. When she tried to move her hand, defendant grabbed it and put it on his private part (that he used to pee), and she pulled it away again. Defendant grabbed her hand again, placed it on his private part, and made her hand move up and down. N.M. was six years old when this happened. N.M. testified that she eventually told her mother when defendant talked to her through the bathroom window, and she told her mother that defendant had touched her private part multiple times.

N.M. described another time when defendant called her into the bedroom while he was folding clothes and touched her private part.

When first interviewed by the police, N.M. was six years old and in first grade. N.M. said that defendant made her do stuff that she did not want to do, and he would touch her "there." Defendant told her to touch his private part, and when she said, "[N]o," he made her do it by grabbing her hand, putting it there, and moving it up and down. N.M. said that defendant stopped when her brother walked in. Defendant also touched her private and moved his finger inside her. Defendant grabbed her hand so N.M. would not tell her mother and told N.M. it was their secret. Defendant did these things to her lots of times. On one occasion, he put his finger into her private part and then took her hand and put it into his pants. She pulled her hand out and locked herself in the bathroom. This happened again one day when she was having a good day, and that made it the worst day.

N.M. finally told her mother after defendant looked at N.M. in the bathroom through the window.

Laura's sister, Samantha S., testified that she had conversations with defendant around the time that N.M. disclosed what he had done to her. During the first

conversation, Samantha called defendant while he was at her mother's house. Defendant told her that he intended to go to Long Beach. A few days later, Samantha again spoke to defendant on the phone, and defendant said that he ran out of gas and was staying at a homeless shelter, but he did not know where he was. Samantha suggested that defendant open an application on his phone so that she could use it to see his location, but defendant refused to do so and claimed that he did not know how. During a third conversation, defendant said that he was still at the homeless shelter.

The parties stipulated that defendant was arrested in Redding on January 21, 2022.

Dr. Anna Washington, a licensed psychologist, testified about Child Sexual Abuse Accommodation Syndrome (CSAAS). CSAAS is an educational framework designed to describe common reactions and patterns of victims of child sexual abuse and to dispel certain myths people have about child sexual abuse. Five components of CSAAS are secrecy; helplessness; entrapment and accommodation; delayed, conflicted and unconvincing disclosures; and retraction. Washington explained the reasons why children may cooperate with the abusing perpetrator rather than telling anyone of the abuse, including circumstances such as the perpetrators using grooming (establishing a positive relationship with the child and escalating to sexual contact), intimidation, or threats to ensure the child's cooperation and secrecy. Children will not usually disclose the abuse right away due to shame and fear of the consequences. Children may disclose abuse incrementally and sometimes retract their statements if they experience negative consequences from the disclosures.

Defendant testified that he did not commit the charged crimes. He heard N.M. in the bathroom and inquired about what she was doing because she had previously gotten into Laura's makeup. N.M. did not respond because she was angry with defendant for having asked her to pick up her room. He later testified that he never spoke to N.M. because he could not see her in the bathroom but then testified that he could see her near

5.

the toilet. Defendant then explained that he did not speak to N.M. because he was upset that she did not pick up her toys earlier.

Laura came outside thereafter and ordered defendant to leave, warning him that her fiancé would kill him. Defendant denied having done anything and testified that Laura never explained why she was upset. Defendant did not know what Laura thought he did but believed it had something to do with him looking in the bathroom window. He denied attempting to speak with N.M. and claimed he tried to enter her room because his clothing was stored in her closet.

Defendant left as requested and went to stay with Laura's mother. After a couple of days, he left because Laura's mother believed the accusations against him and was not happy that he was there. He had also received a call from his daughter in Redding that she had been in an accident and decided to go see her. His car broke down and ran out of gas on the way. Defendant stayed in his car near a homeless shelter until he could "get some money from somebody" for gas. Samantha told him that he was being investigated, but he did not believe that he would be arrested.

The prosecutor questioned defendant as to why he did not tell Samantha where he was going. Defendant said that he told Samantha that his car broke down, but he did not know where he was. He only had directions to his daughter's location because another individual had programed the address into his phone. Defendant testified that did not tell Samantha where he was going because Samantha did not like his daughter. He also did not tell anyone he intended to visit his daughter in Redding because he did not intend to stay. He later testified that he did not tell Samantha where he was going because he hardly ever talked to her and "why would [he] tell her?"

Defendant explained that he initially told Samantha that he was going to Long Beach because his daughter lived there and he did not realize his daughter had moved to Redding. His daughter called him while he was staying with Laura's mother, and he decided to visit her because he was concerned with her safety. Defendant explained that

6.

he could not use the GPS on his phone to tell Samantha where he was because he was driving at the time but then admitted that he had already ran out of gas and could have looked at the GPS but did not. He also claimed that it was normal for him to travel without notifying his family where he was going because there was no reason for his family to know.

## DISCUSSION

### I. *The trial court did not err in admitting evidence of defendant's flight.*

#### A. Background

The prosecutor provided an offer of proof that Samantha would testify she had a conversation with defendant in which he told her he intended to go to Long Beach. During a second conversation, defendant claimed that did not know where he was but had run out of gas and was staying at a homeless shelter, and he would not allow Samantha to assist him in determining his location. The prosecutor argued that defendant's action could be construed as flight after having been accused of sexually assaulting N.M. and permitted an inference that defendant was conscious of his own guilt.

After reviewing applicable case law, the trial court ruled that it would allow some evidence regarding flight. "That's going to be the testimony of [Samantha] and the arrest in Redding …." The court excluded testimony as to the investigative techniques and efforts to locate defendant in Redding after finding that it had little probative value. The court concluded, "I'm just the gatekeeper to see if there is sufficient basis and relevance to allow it and that it's not overly prejudicial regarding its probative value.· Those two items of evidence shouldn't take too long …. And the cases that I read … warrant the introduction of that evidence and the flight instruction."

#### B. Applicable Law and Standard of Review

The prosecutor moved to admit evidence of defendant's flight to Redding. After a hearing, the court partially granted the motion while excluding evidence as to the investigation which led to defendant's arrest in Redding. The court found the proffered

7.

evidence probative to show consciousness of guilt and not unduly prejudicial under Evidence Code section 352. Defendant contends the court erred.

"Flight is a factor tending to connect an accused with the commission of an offense. [Citations.] Standing alone, it is not sufficient to establish guilt; but flight immediately after the commission of an offense is a circumstance that may be considered, with other facts in the case, as tending to show a consciousness of guilt." (*People v. Moore* (1963) 211 Cal.App.2d 585, 600.)

"Evidence showing consciousness of guilt, such as flight …, is generally admissible within the trial court's discretion. The court's ruling is reviewed for abuse of discretion." (*People v. Anderson* (2018) 5 Cal.5th 372, 391.) We find no abuse.

## C.    Analysis

Laura testified that she told defendant of N.M.'s accusations and ordered him to leave the house. Defendant then left and stayed with Laura's mother. While there, Laura's sister, Samantha, spoke with defendant asked him what he planned to do. Defendant said he intended to go to Long Beach. Thereafter, Samantha spoke to defendant who indicated that his car ran out of gas. When asked where he was located, defendant told Samantha that he did not know, and he did not cooperate in her efforts to assist him in using his phone to determine his location. During a third conversation, defendant told Samantha that he was at a homeless shelter. If believed, a jury could find that this evidence showed that defendant left the area and deliberately avoided revealing his location to avoid apprehension and, therefore, reflected defendant's consciousness of his own guilt.

Defendant argues that no such inference could be drawn in light of several facts. First, he argues that he left Laura's house because she ordered him to leave. However, the inference of flight does not derive from the fact that defendant left Laura's residence. Rather, he left the area thereafter without advising any family member as to where he intended to go. Defendant also argues that leaving the area could lead to an inference of

flight only if defendant had other family members or living options in the area. While we do not agree that such foundational facts are necessary before admitting such evidence, we note that defendant voluntarily left the residence of Laura's mother, where he had been staying, and also testified that he initially intended to ask to stay with the pastor of his church, thus evidencing that defendant did know individuals in the area who could provide him housing. Defendant also argues that he was aware that his telephone could be traced and that he communicated with Samantha anyways, evidencing he was not attempting to hide his location. For these reasons, defendant argues that the evidence fails to necessarily show consciousness of guilt.

However, "the existence of alternate explanations for the defendant's behavior does not necessarily defeat the court's discretion to admit consciousness-of-guilt evidence." (*People v. Anderson, supra*, 5 Cal.5th at pp. 391–392, citing *People v. Pensinger* (1991) 52 Cal.3d 1210, 1243–1244 [instruction on flight as showing consciousness of guilt permissible even though there was a possible innocent explanation for his actions]; *People v. Remiro* (1979) 89 Cal.App.3d 809, 845 [evidence of an escape attempt admissible despite the possibility the consciousness of guilt might be ascribed to a different crime].) " '[T]he existence of explanations—other than consciousness of guilt of the crime charged—for conduct which may be interpreted as flight is relevant to the *weight* of the evidence showing flight, but *not* to its admissibility .…" (*Anderson*, at p. 392; see *People v. Moore, supra*, 211 Cal.App.2d at p. 600 [for trial judge to determine whether leaving area shortly after commission of crime constituted intentional flight]; *People v. Bennett* (1953) 122 Cal.App.2d 244, 252 [evidence that Bennett departed from the state a short time after the commission of the crime and remained away until apprehended sufficient for flight instruction; weight and credence of Bennett's explanations for jury to determine]; *People v. Peak* (1944) 66 Cal.App.2d 894, 911 [evidence that Peak disappeared day indictment returned but returned a week later to self-surrender could be used as evidence of flight and for the jury to determine whether Peak

knew of indictment and his intent in leaving], disapproved on another ground in *People v. Carmen* (1951) 36 Cal.2d 768, 775–776; *People v. People v. Rokes* (1937) 18 Cal.App.2d 689, 693 [leaving area shortly after commission of crime sufficient evidence to warrant flight instruction].)

We conclude that evidence of defendant's conversations with Samantha were sufficient to support an inference that defendant fled the area to avoid apprehension for his lewd acts upon N.M., and the trial court did not abuse its discretion in concluding that the probative value of the evidence outweighed any prejudicial effect.

## II. *The trial court did not err in instructing the jury that defendant's flight could demonstrate consciousness of guilt.*

### A. Background

Both defendant and the prosecutor agreed to the court's proposed jury instructions. The court instructed the jury: "If the defendant fled immediately after the crime was committed or after he was accused of committing the crime[,] that conduct may show that he was aware of his guilt. If you conclude that the defendant fled[,] it is up to you to decide the meaning and importance of that conduct, however, evidence that the defendant fled cannot prove guilt by itself."

### B. Applicable Law and Standard of Review

Defendant next argues that the trial court erred by instructing the jury on flight because there was no factual basis for it. We disagree.

We review a claim of instructional error de novo. (*People v. Frazier* (2024) 16 Cal.5th 814, 950.) " 'The giving of [a flight] instruction is statutorily required when flight evidence is relied upon by the prosecution.' [Citation.] ' "In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' [Citations.] ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require,

10.

however, a purpose to avoid being observed or arrested." ' " ' " (*Ibid.*, second bracketed insertion added.) " '[T]he instruction [does not] require[] … a defined temporal period within which the flight must be commenced .…' " (*Id.* at pp. 950–951, citing *People v. Carter* (2005) 36 Cal.4th 1114, 1182 [flight instruction proper where "the evidence introduced by the prosecution establish[ed] that [the] defendant left California in the days immediately following the charged offenses"].) "Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest 'a purpose to avoid being observed or arrested.' [Citations.] To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)

If there is evidence that defendant fled and such evidence is relied upon as tending to show guilt, then a trial court should instruct the jury on flight in accordance with section 1127c. (*People v. Mason* (1991) 52 Cal.3d 909, 943.) Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

C.    **Analysis**

In this case, there was evidence that defendant left the area within a few days of being accused of sexually assaulting N.M. When speaking with Samantha while still at her mother's residence, defendant stated that he intended to go to Long Beach. However, he was later found and arrested in Redding. Additionally, defendant would not identify his location during another conversation with Samantha and avoided her attempts to assist him when he claimed that he did not know where he was located. Defendant also

11.

testified that he could have identified his location from the GPS information on his phone.  As we have already discussed, defendant's flight rationally supported an inference that he was conscious of guilt despite his explanations to the contrary.  For these reasons, it was proper to instruct on flight.  (See *People v. Bonilla, supra*, 41 Cal.4th at p. 329; *People v. Mason, supra*, 52 Cal.3d at p. 943.)

## DISPOSITION

The judgment is affirmed.